**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**E.A. GREGORY, Vonna Jo Gregory, G.W. Atkinson and Robert T. Spurlock, Jr., Defendants-Appellants.**

Nos. 82–7145, 82–7152.

United States Court of Appeals,
Eleventh Circuit.

April 23, 1984.

Rehearing and Rehearing En Banc Denied July 30, 1984.

Linda D. Benson, East Tallassee, Ala., for Atkinson and Spurlock.

Morgan & Burns, Peter F. Burns, Mobile, Ala., for E.A. and Vonna Jo Gregory.

Ginny S. Granade, Asst. U.S. Atty., Mobile, Ala., for plaintiff-appellee.

Before GODBOLD, Chief Judge, RONEY and SMITH *, Circuit Judges.

RONEY, Circuit Judge:

E.A. Gregory, Vonna Jo Gregory, G.W. Atkinson and Robert T. Spurlock appeal their convictions for a conspiracy to misap- ply bank funds, make false statements to banks and commit wire fraud, in violation of 18 U.S.C.A. §§ 371, 656, 1014 and 1343. The Gregorys and Atkinson also appeal their convictions for substantive counts of misapplication of bank funds, 18 U.S.C.A. §§ 656, 2. They challenge (1) the Government's use of immunized testimony given by the Gregorys at a bankruptcy creditors' meeting, (2) the procedures used to select the grand jury, (3) the sufficiency of the evidence supporting their convictions, (4) evidentiary rulings by the trial court, (5) the court's denial of severance for Atkinson and Spurlock, and (6) the court's denial of motions for new trial and acquittal. We vacate the Gregorys' convictions, and remand for a hearing to afford the Government an opportunity to show that all of its evidence not formerly examined by the district court was derived from legitimate, independent sources. We affirm as to all other issues.

The conspiracy alleged in this case concerns events which occurred while E.A. Gregory and Vonna Jo Gregory controlled an Alabama bank. The Gregorys purchased a controlling interest in the Bank of Camden (Alabama) in November, 1975. Both were elected to the Board of Directors, and Mr. Gregory became Chairman of the Board. The bank was renamed Wilcox County Bank (Bank). While the Gregorys held a controlling interest in the Bank, defendant G.W. Atkinson was the Secretary to the Board of Directors and a Vice-President of the Bank. Defendant Robert T. Spurlock, Jr., was a Vice-President of the Bank and became a member of the Board. The criminal charges of conspiracy to misapply bank funds, make false statements and commit wire fraud grew out of transactions between the Wilcox County Bank and the Gregorys, their corporations, and their associates, which involved the Bank's (1) purchase of participations in loans from other banks which had loaned money to the Gregorys and their corporations; (2) opening of correspondent bank accounts with banks which were controlled

* Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation.

by or had loaned money to the Gregorys; (3) purchase of goods and services from the Gregorys and their corporations; (4) loans to associates of the Gregorys who lived outside the Bank's trading area; and (5) loans to the Gregorys themselves.

The substantive counts of misapplication of bank funds involve loans made by the Bank to Gregory-owned corporations after the Gregorys sold their bank stock to Mr. and Mrs. Mark Lyons III on April 8, 1977. The Gregorys retained voting rights in matters affecting capitalization of the Bank. Mr. Lyons was then elected Chairman of the Board, and he also became Executive Vice-President and a member of the loan committee. Between April 15, 1977, and May 10, 1977, the Bank made ten loans to corporations owned by the Gregorys, for a total of $864,000. These loans were approved by the Board of Directors or by the loan committee and also by Lyons.

The facts will be developed further in this opinion as it discusses the defendants' various contentions on appeal.

## I. Government's Use of Gregory's Bankruptcy Testimony

On June 19, 1978, after all the events which gave rise to the criminal charges, the Gregorys filed for relief under Chapter XII of the Bankruptcy Act. Other corporations owned principally by the Gregorys filed for relief under Chapter XI. At the first meeting of creditors, on July 26, 1978, the Gregorys testified individually and as representatives of the corporations. They requested and were granted immunity under 18 U.S.C.A. § 6002, which provides that no such testimony "or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case," with inapplicable exceptions. 11 U.S.C.A.

§ 344, formerly 11 U.S.C.A. § 25(a)(10).[1] The FBI and FDIC were actively investigating the Gregorys in anticipation of criminal proceedings when the bankruptcy meeting took place.

The testimony concerned the finances of the Gregorys and their corporations. FDIC personnel, along with representatives of 23 other creditors, attended the meeting.

Before trial, the defendants moved to dismiss the indictment, claiming that prosecution of the case had been tainted by the Government's exposure to immunized testimony given by the Gregorys at the creditors' meeting. The trial court denied this motion on March 5, 1982, after a hearing. On appeal, the defendants ask this Court to vacate their convictions and render a judgment dismissing the indictment, arguing (1) the trial judge improperly shifted to them the burden of proving that the immunized testimony was used, and (2) the immunized testimony was used in the investigation and prosecution of the case.

The allocation of the burden of proof where a defendant claims the Government is attempting to improperly use immunized testimony was set forth in *Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964) which held that:

> Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence.

378 U.S. at 79 n. 18, 84 S.Ct. at 1609 n. 18. This was reaffirmed in *Kastigar v. United States*, 406 U.S. 441, 460, 92 S.Ct. 1653, 1664, 32 L.Ed.2d 212 (1972), where the Supreme Court further observed that this burden "is not limited to a negation of

---

**1.** 11 U.S.C.A. § 344, formerly section 7(a)(10) of the Bankruptcy Act, 11 U.S.C.A. § 25(a)(10), provides:

Immunity for persons required to submit to examination, to testify, or to provide information in a case under this title may be granted under part V of title 18.

Pub.L. 95–598, Nov. 6, 1978, 92 Stat. 2565. § 6002 of Title 18 provides for immunity in court compelled testimony.

taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." 406 U.S. at 460, 92 S.Ct. at 1664.

■■■ The Gregorys contend that the district court placed a greater threshold burden on them than that required by *Kastigar* and its progeny by requiring them to "point out specifically—testimony that [they] gave that was subject to immunity, and how that testimony, and where that testimony, subsequently shows up . . . or . . . was presented to the Grand Jury or came to the attention of the Grand Jury." The court proceeded to require the Government to establish a legitimate, independent source for each of the items identified by the defendants. Our review of the testimony below indicates that the Government met its burden as to those items.[2] We affirm the holding of the district court in all respects as to the evidence considered.

By limiting the evidentiary materials thus identified for examination for taint at the outset, however, the court relieved the Government of a portion of its "heavy burden of proving that all of the evidence it [used] was derived from legitimate independent sources." 406 U.S. at 461–62, 92 S.Ct. at 4665–66.

■■■ Section 6002 speaks to use of the immunized testimony against the witness in "any criminal case," and thus prohibits its use in the grand jury proceedings as well as at trial. *United States v. Beery*, 678 F.2d 856, 860 (10th Cir.1982); *United*

2. The Gregorys' objections to evidence they claimed the Government had derived from immunized testimony, and the Government's responses as to the sources of the testimony, are as follows:

1. Branum's testimony about loans to McCollister and Don.
   Response: Sources for investigation were record reviews conducted before July 26, 1978.
2. Liggon's testimony.
   Response: Sources were record reviews in April, 1978, and leads from those reviews.
3. Whitehead's testimony.
   Response: Source was a review of the Bank's files in April, 1978.
4. Parrent's testimony about Gregory loans and participation at the Bank of East Alabama.
   Response: Source was a review of records at the Bank of East Alabama in April, 1978.
5. Don's testimony.
   Mayfield's testimony about inter-corporate transfers.
   McCollister's testimony.
   Mrs. Gregory's testimony during cross-examination about Don loan and Mississippi Bank.
   Response: Sources were interviews and record reviews conducted before July 26, 1978.

The Government thus demonstrated independent, legitimate sources for the specific items at trial allegedly derived from the immunized testimony.

To show the immunized testimony had not been used as an investigatory lead, the Government pointed to these sources for information contained in the immunized testimony:

1. Immunized testimony about Charles Whitehead (loan recipient).
   Response: Source was a review made on April 10, 1978 of the records of the Bank's commercial loans.
2. Immunized testimony about ALM, Inc., the sale of the Sheraton and distribution of sale proceeds.
   Response: Source was April 10, 1978 review of the Bank's commercial loans, which led to a review of other ALM-related documents.
3. Immunized testimony about intercorporate loans and transfers of assets.
   Response: Source was an FDIC review of Gregory-related checking accounts at various banks prior to July 26, 1978.
4. Immunized testimony about judgments obtained by the FDIC against the Gregorys and their corporations.
   Response: The FDIC knew of these judgments independently of the immunized testimony.
5. Immunized testimony about commissions received from Centennial Life Insurance Company.
   Response: Source was a review on April 13, 1978 of expenses paid by the Bank to the Gregorys and related companies.

Government witnesses also testified that the Gregory's immunized testimony was not used.

In light of the Government's (1) independent sources for the evidence presented at trial, (2) independent sources for the information revealed in the immunized testimony, and (3) witnesses who testified that the immunized testimony had not been used in the investigation, the trial court's conclusion that the Government showed independent, legitimate sources for evidence claimed by the Gregorys to be improperly tainted was not clearly erroneous.

*States v. Hinton*, 543 F.2d 1002, 1009 (2d Cir.1976), *cert. denied*, 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977); *United States v. Kurzer*, 534 F.2d 511 (2d Cir. 1976). The defendants could not be presumed to have knowledge of all of the evidence presented to the grand jury or employed in the Government's investigation. Under such circumstances, a ruling only on those items identified by the defendants is not sufficient. No cases have been cited to this Court in which the procedure employed by the district court in this case was followed, and we find no support for affirmance of that practice in light of *Kastigar*, and this Court's application of *Kastigar* in *United States v. Seiffert*, 463 F.2d 1089 (5th Cir.1972). On the contrary, in *Seiffert*, this Court remanded in order that the Government might "show how it acquired *all* of the evidence admitted below." 463 F.2d at 1092 (emphasis added). In the case before us, remand is necessary for the limited purpose of allowing the district court to ascertain whether the portions of the Government's evidence at trial not challenged by the Gregorys. and the evidence before the grand jury, not formerly considered by the district court, were in fact "derived from a legitimate source wholly independent of the compelled testimony." *Kastigar*, 406 U.S. at 460, 92 S.Ct. at 1664. If the Government can affirmatively make such a showing, the Gregorys' convictions must stand. If the evidence presented to the grand jury and at trial is not found to have been properly derived from legitimate independent sources, then the indictment must be dismissed or a new trial ordered, depending on whether the Government fails to prove independent sources for its grand jury evidence, or only for its trial evidence, unless the error is held harmless beyond a reasonable doubt. If the Government sustains its burden of proof, or if use of the prohibited evidence is found to be harmless, then the convictions should be reinstated. *See United States v. Beery*, 678 F.2d at 863.

## II. *Jury Selection Act*

Defendants contend the indictment should have been dismissed because the procedures attending the selection of the grand jury that indicted them did not comply with certain procedural requirements of the Jury Selection Act of 1968, 28 U.S.C.A. §§ 1861–1869, and the Local Plan (Plan of the United States District Court for the Southern District of Alabama for the Random Selection of Grand and Petit Jurors).

Defendants moved to dismiss the indictment and submitted nine affidavits. The affidavits focused on conversations with the district court clerk to the effect that the clerk (1) had not prepared the alphabetical list of names taken from the master jury wheel; (2) had not executed affidavits indicating he had verified the accuracy of the county voter registration lists used to construct the master jury wheel but had performed spot checks to verify those voter registration lists; (3) did not possess the certificate of the appropriate Mobile County official indicating that all registered voters had been considered in the selection process; (4) did not possess a document verifying that his March 27, 1979, order to the Mobile Data Center to produce 70 names for a grand jury venire was carried out as the order specified; (5) did not systematically process completed juror qualification forms; and (6) did not retain the 1976 Mobile County voter registration list which was one source of data used to construct the master jury wheel, and the list could not be reproduced.

The district court assumed the nine affidavits accompanying the motion to be true, but rejected defendants' claim that the omissions amounted to a "substantial" failure to comply with the Act: "All of the defects which the defendants point to are technical deviations from the Act and the local plan...."

This Court recently construed the Jury Selection and Service Act in *United States v. Bearden*, 659 F.2d 590 (5th Cir. Unit B 1981), *cert. denied*, 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982). In *Bearden*, the clerk had violated the Act or local plan by selecting the starting number arbitrarily rather than randomly, by failing to post

public notices of selection procedures, and by improperly excusing or disqualifying individuals from qualified jury wheels, and by granting permanent rather than temporary excusals to persons summoned for jury service. The court held that none of these violations constituted a "substantial" failure to comply with the Act or local plan.

We held that the alleged violations must be weighed against the underlying principles of the Act. A substantial violation of the Act will be found only when two important general principles are frustrated: (1) random selection of juror names and (2) use of objective criteria for determination of disqualifications, excuses, exemptions, and exclusions. Mere "technical" deviations from the Act or even a number of them are insufficient if they do not frustrate the obtaining of jury lists that represent a cross section of the relevant community and do not result in impermissible forms of discrimination and arbitrariness.

Defendants contend that the acts of noncompliance in this case frustrated the goal of random selection of jurors in that Mobile County was overrepresented in the grand jury that indicted them. This apparent geographical disparity did not result in a substantial failure to comply with the Act. First, it is the master jury wheel, not the actual grand jury, which must be geographically proportional. Under the Act, the local plan "shall ensure that each county, parish, or similar political subdivision within the district ... is substantially proportionally represented in the master jury wheel for that judicial district." 28 U.S.C.A. § 1863(b)(3). Second, the grand jury venire in this case, comprising 70 individuals, was substantially proportional geographically. Although residents of Mobile County were the most numerous on the venire, Mobile County is clearly the most populous county in the district. A party claiming disproportionate representation of a particular group in a jury selection process must show a substantial disparity between that group's representation in the selection process and its representation in the general population. *See, e.g., United States v. Brummitt,* 665 F.2d 521, 528–30 (5th Cir.1981) (Hispanic Americans), *cert. denied,* 456 U.S. 977, 102 S.Ct. 2244, 72 L.Ed.2d 852 (1982); *United States v. Hawkins,* 661 F.2d 436, 442–43 (5th Cir. Unit B 1981) (residents of divisions within judicial district), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2274, 2967, 73 L.Ed.2d 1287 (1982); *United States v. Goff,* 509 F.2d 825, 826–27 (5th Cir.) (blacks and indigents), *cert. denied,* 423 U.S. 857, 96 S.Ct. 109, 46 L.Ed.2d 83 (1975). The counties in this case were "substantially proportionally represented." 28 U.S.C.A. § 1863(b)(3). Venires or grand juries need not reflect county populations exactly. *See United States v. Hawkins,* 661 F.2d at 442–43.

The Court noted in *Bearden,* "Congress did not intend for 'random selection' under the Act to be defined as 'statistical randomness' ..." 659 F.2d at 602. "It is sufficient for the purpose of this legislation if the plan adopts some system of selection that affords no room for impermissible discrimination against individuals or groups." S.Rep. No. 891, 90th Cong., 1st Sess. 16 n. 9 (1967), U.S.Code Cong. & Admin.News 1968, p. 1792, *quoted in Bearden,* 659 F.2d at 602. While the methods used here may have resulted in venires that were not statistically random, there has been no showing that they resulted in discriminatory selection of jurors or otherwise prevented jury panels from consisting of fair cross-sections of the community.

The failure to prepare an alphabetical list of names drawn from the master jury wheel (28 U.S.C.A. 1864(a); Local Plan pp. 7–8), the names that formed the tentative qualified jury wheel, had no impact on the names drawn from the master jury wheel. The people whose names were selected if not exempted, excused, or disqualified, were placed on the qualified jury wheel. Whether the qualified wheel was arranged alphabetically was immaterial to random selection, for the selection of names from that wheel to construct venires was done by computer according to a random formula. The failure to prepare the

alphabetical list, to the extent it affected the process, affected all counties and potential jurors equally, and was not a substantial violation of the Act. *See United States v. Evans*, 526 F.2d 701, 705–06 (5th Cir. 1976) (no substantial violation of Act where alphabetical lists and Jury Selection Report were not prepared).

The nonexistence of the alphabetical list made it impossible for the clerk to enter notations concerning exemption, excusal, or disqualification next to the names of those excluded from service. This was also a technical violation which did not give rise to impermissible discrimination. Although the clerk failed to verify county voter registration lists, there is no allegation that the clerk's "spot checks" of these lists were discriminatory, either by design or by effect. The failure to possess (1) a certificate of a Mobile County official indicating that all registered voters had been considered in the selection process, (2) a document verifying precise compliance with the March 27, 1979, order to the Mobile Data Center for a 70-person venire, and (3) the 1976 Mobile County voter registration list, absent any proof of underlying substantive irregularities, was also a purely technical violation of the Act and Local Plan.

Because the procedure in this case did not result in a "substantial failure to comply with the Act," or otherwise prevent jury panels from consisting of fair cross-sections of the community, we affirm the district court's refusal to dismiss the indictment on this basis.

### III. *Sufficiency of the Evidence*

■ All of the defendants claim the evidence was insufficient to support their convictions. In reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the Government, and make all reasonable inferences in support of the jury verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Davis*, 679 F.2d 845, 852 (11th Cir.1982), *cert. denied*, 459 U.S. 1207, 103 S.Ct. 1198, 75 L.Ed.2d 441 (1983).

### A. *The Gregorys*

*Conspiracy to Misapply Bank Funds*

The conspiracy alleged in this case involved various transactions between the Bank and the Gregorys, their corporations, and their friends and associates during the time the Gregorys owned a controlling interest in the Bank. The evidence of these transactions presented by the Government is summarized as follows:

1. Participation in Loans

   On February 7, 1976, the Bank purchased participations in loans of $498,-741.98 from the Bank of East Alabama. That bank had lent the Gregorys and their corporations $676,-500 in 1975 and $993,500 in 1976, including a $150,000 loan to Atkinson, secured by the Bank stock. The minutes of the directors' meetings do not show that the Gregorys revealed their connection with Bank of East Alabama to the Board.

2. Correspondent Banking Relationships

   The Bank opened correspondent accounts with

   (a) Southern National Bank of Birmingham on 11–11–75. It had lent Mrs. Gregory $350,000 the day before, taking a security interest in the Bank stock.

   (b) First Bank of Macon and Chilton County Bank on 11–11–75. Both were Gregory-controlled banks.

   (c) Charter National Bank on 3–22–76. Mrs. Gregory had borrowed $55,-000 there in February, and aggregate Gregory borrowings there since 1972 exceeded $2 million.

   (d) First National Bank of Pensacola on 4–8–77. The Gregorys had $500,000 loans outstanding there.

   (e) Mississippi Bank on 4–8–77. The Gregorys had $250,000 in outstanding loans.

3. Purchase of Goods and Services from the Gregorys and their corporations

(a) The Bank paid $15,000 to Gregory-owned Faith Investment Company for "Customer Appreciation Day," a country and western show.

(b) The show was catered by Sea Ranch Restaurant (Gregory-owned).

(c) Stationery, supplies and a $2500 flag pole were purchased from Faith Investment Co.

(d) Gregory Motors leased a car and a sign to the Bank.

(e) The Bank paid Gregorys $25,000 for private plane travel from January through August of 1976.

(f) The Bank paid Gregory $50,000 for property he had purchased for $25,000 one year earlier, and which he had leased to the bank at $325 per month.

4. Loans to Out-of-Territory Associates of Gregory

(a) Gregory arranged for Norman DeWeese to borrow money in order to purchase stock in Gregory companies.

(b) On April 8, 1977, Gregory arranged for a $25,000 unsecured loan for Bill Agall, his in-house accountant. Gregory later purchased Bank stock from Agall.

(c) Also on April 8, 1977, Gregory made arrangements for a $25,000 unsecured loan to Tom Mayfield, his comptroller. When Mayfield and his wife had borrowed $7,500 from the Bank only a week earlier, it required that he pledge home furnishings, appliances and a car as collateral.

(d) In December, 1976, the Gregorys arranged for Charles Whitehead to borrow $100,000 from the Bank for 3 months. Whitehead was prepared to pay the loan off when Gregory borrowed $100,000 from Whitehead, assuring him that his Bank note would be renewed, which it was.

(e) On March 30, 1977, Dr. Don, Spurlock's father-in-law, borrowed $25,000 from the Bank. Don testified before the grand jury that in April, 1977, he loaned $25,000 to a Gregory corporation. Also in April, 1977, at Gregory's suggestion, Don borrowed $150,000 from the Bank and purchased a certificate of deposit at the Mississippi Bank. In October, 1977, Don arranged for Spurlock to cash in the certificate and loan the proceeds to Gregory Motors.

(f) On June 17, 1977, Rolphe McCollister of Baton Rouge borrowed $100,000 from the Bank. Gregory knew the Bank had made the loan. Two weeks later the Gregorys borrowed $100,000 from McCollister.

5. Loans to the Gregorys

(a) By February of 1977, Mr. and Mrs. Gregory each had loans totalling $226,000 from the Bank which equalled the legal lending limit for each of them. They had been aware since the summer of 1976 that both the State Banking Department and FDIC did not think they were entitled to separate lines of credit because they had not demonstrated the ability to individually service their debts. As of February, 1977, their loans represented 99.4% of the Bank's capital structure.

The Gregorys claim that because the participations, correspondent accounts, expense payments and loans were approved by the Board of Directors, there was no misapplication of bank funds under 18 U.S. C.A. § 656. While the valid consent of the Board of Directors is a defense to misapplication, the Board cannot validate a fraud on the bank. *United States v. Salinas*, 654 F.2d 319, 328 (5th Cir.1981) *overruled in part on other ground, United States v. Adamson*, 700 F.2d 953 (5th Cir. Unit B 1983); *United States v. Beran*, 546 F.2d 1316, 1321 (8th Cir.1976). Thus, if the co-conspirators had an intent to defraud, "approval of the board of directors is no longer

material to whether there was a misapplication of bank funds." *Salinas,* 654 F.2d at 328 (quoting *Beran,* 546 F.2d at 1321).

■ The intent of the conspirators is a question of fact for the jury, and the jury in this case found a specific intent to injure or defraud the bank. That the directors may have reviewed the transactions at some point does not absolve the coconspirators from culpability for misapplication of the bank's funds, particularly here where the evidence showed that the Gregorys were the moving force behind many of the Board's actions.

■ We recognize that this is an unusual case, in that the Gregorys' intent to injure the bank cannot be directly proven through actions which were against bank rules or outside their authority. There was sufficient evidence of their intent, however, from the knowing, voluntary actions of the Gregorys which tended to injure the bank. *See United States v. Adamson,* 700 F.2d 953, 965 (5th Cir. Unit B 1983) (the appropriate *mens rea* standard for § 656 is knowledge); *United States v. Southers,* 583 F.2d 1302 (5th Cir.1978). In addition, there was testimony to the effect that (1) the bank president was required to call Gregory every day, (2) loan officers could not loan more than 45,000 without Gregory's approval, (3) the Board was not informed, in establishing correspondent accounts, of the extent of the Gregorys' dealings with the proposed correspondent banks, (4) the Board was not informed that the State Banking Department disapproved of separate lines of credit for each of the Gregorys, and (5) the Board was not informed that Faith Investment Company was to receive a commission from the country and western show. Although some of this testimony was disputed, there was sufficient evidence from this testimony and the Gregorys' actions to allow the jury to conclude that they knowingly participated in fraudulent transactions.

*Specific Counts of Misapplication*

Aside from the conspiracy count, the Gregorys were convicted of eight counts of misapplication of bank funds involving loans made by the Bank to Gregory-owned corporations after April 8, 1977, when the Gregorys sold their stock in the bank to Mr. and Mrs. Mark Lyons III.

The Gregorys argue that there was insufficient evidence to show that after April 8, 1977, they maintained a "connection" with the bank as required by 18 U.S.C.A. § 656, which provides:

> Whoever, being an officer, director, agent or employee of, or *connected in any capacity* with any Federal Reserve bank, member bank, national bank, or insured bank ... embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank ... shall be fined not more than $5,000 or imprisoned not more than five years, or both ...

18 U.S.C.A. § 656 (emphasis added).

The statute does not define those who are "connected" with the bank. The Government argues that the Gregorys were "connected" within the meaning of § 656 in three ways. *First,* in the sale of stock to Lyons, the Gregorys received a promissory note from Lyons calling for 360 monthly payments of $8,834.94 each, and granting a security interest in 31,000 shares of stock. Lyons was thus obligated to pay the Gregorys over $8000 per month, and he defaulted on this obligation in less than a year. *Second,* in the sale, the Gregorys retained voting rights in the 31,000 shares of stock on any matter affecting capitalization of the bank. *Third,* the bank had a heavy concentration of loans to the Gregorys.

Although these precise "connections" with a bank have not been previously considered, similar "connections" have placed defendants within the ambit of § 656. In *Garrett v. United States,* 396 F.2d 489 (5th Cir.), *cert. denied,* 393 U.S. 952, 89 S.Ct. 374, 21 L.Ed.2d 364 (1968), the Court held that defendants who had purchased a controlling interest in the bank, directed that it be placed in the name of their corporation and in the name of an associate, and caused

four of their employees and associates to be elected to the seven-member board of directors, were "connected" with the bank for purposes of § 656. The Court noted that the defendants had been active in bank affairs in securing the purchase of mortgages and in increasing the bank's deposits. *See also United States v. Fulton*, 640 F.2d 1104 (9th Cir.1981) (employee of bank's wholly owned subsidiary mortgage company); *United States v. Edick*, 432 F.2d 350 (4th Cir.1970) (department manager in the subsidiary of a holding company which held a controlling interest in the bank).

Thus, there was sufficient evidence for the jury to conclude that the Gregorys were "connected" within the contemplation of the statute. In addition, the evidence supported a conviction under the theory that the Gregorys aided and abetted Lyons, an officer, director and majority stockholder, in misapplying bank funds. The jury could have inferred that Lyons allowed the bank to extend loans to the Gregory corporations because of his personal debt to the Gregorys.

### B. *Atkinson*

G.W. Atkinson argues the evidence is insufficient to support his convictions for conspiracy and six counts of misapplication of bank funds. While the Gregorys held a controlling interest in the Bank, Atkinson became the Secretary to the Board of Directors in August, 1976, and a Vice-President of the Bank in November, 1976. He worked at Faith Investment Company in Pensacola.

Although Atkinson claims he exerted no control over the Bank's decisions, the evidence showed that he generally managed the day-to-day affairs of the Bank. His position clearly gave him knowledge of, and participation in, the actions of the Gregorys during their control of the Bank. In addition, Atkinson received a $150,000 loan from the Bank of East Alabama before the Bank purchased participations in loans from that bank. On April 5, 1977, Atkinson borrowed $50,000 unsecured from the Bank. He already had $255,000 in outstanding debts at that time. The evidence was sufficient to connect Atkinson to the conspiracy.

Regarding the substantive misapplication counts, Atkinson signed notes for some of the loans from the Bank to Gregory corporations totalling $714,000 in the month following the bank sale. Atkinson testified that he had no hesitation signing these loans as a corporate officer although he was aware of the FDIC warnings about concentrations of credit with the Gregorys. Despite Atkinson's argument that he intended only to make legal loans, the jury could infer from his actions that he intentionally aided in the misapplication of bank funds.

### C. *Spurlock*

Spurlock challenges the evidence supporting his conspiracy conviction. Spurlock was hired by Gregory at the Chilton County Bank in April, 1975, and was transferred to the Bank in March, 1976 as Vice-President. He became a director in November, 1976. He held both of these positions until April 8, 1977, when the Gregorys sold their controlling interest in the Bank.

Spurlock's part in the alleged conspiracy occurred shortly before the Gregorys sold their stock in the Bank. The Bank made a loan to Spurlock's father-in-law, Dr. Horace Don, on March 30, 1977. Spurlock approved the $150,000 loan to Don as a member of the Board of Directors, and signed the cashier's check as an officer of the Bank. Don testified that in April, at Gregory's suggestion, Don purchased a certificate of deposit at the Bank of Mississippi. In October, Gregory sent Spurlock to Iowa to visit Don. Don gave Spurlock a sealed letter, and told him to take it to the Mississippi Bank in Jackson, Mississippi, where Spurlock would get a check in his name. Don told Spurlock to take this check to Gregory. Spurlock received the check, took it to Pensacola, endorsed it, and gave it to Gregory. It thus appears that Grego-

ry received some benefit from the loan to Spurlock's father-in-law.

■ Although Spurlock testified that he did not know about the Mississippi certificate of deposit, the question of Spurlock's intent is one for the jury. Although the evidence against Spurlock is not overwhelming, the evidence that Spurlock went to Mississippi, received the check and transmitted the funds was sufficient for the jury to infer that Spurlock was a knowing participant in a scheme to misapply bank funds.

## IV. *Evidentiary Rulings*

### A. *Cease and Desist Order*

■ Contrary to defendants' contention, the trial court's admission of a temporary cease and desist order entered by the FDIC was not an abuse of discretion.

*First,* it was issued within the time frame in the indictment, and was part of the general background of the controversy between the Gregorys and the FDIC. *Second,* part of the Gregorys' defense was that their financial affairs crumbled when the FDIC cut off their credit by cease and desist orders which prevented them from borrowing funds. The Government introduced the order to show that it did not prohibit the Gregorys from borrowing from other banks with which they had no connection, and therefore did not cause their ruin. *Third,* the order, issued on May 11, 1977, was relevant because it was issued the day after the last loan by the Bank to a Gregory corporation. The jury could infer from this that additional loans would have been made if the order had not prohibited them. *Fourth,* the prosecution contended that because the Gregorys had to be consulted about the order, even after their bank stock had been sold, this showed a "connection" with the bank under 18 U.S.C.A. § 656.

The defense referred to the order in its closing argument, arguing that it required the Gregorys to withdraw their deposits from the Bank, and that certain loans should not be considered criminal acts be-

cause the order did not prohibit their renewal.

Arguing that the order should not have been admitted, defendants rely primarily on *United States v. Christo,* 614 F.2d 486 (5th Cir.1980). In *Christo,* the Government attempted to introduce certain cease and desist orders issued by the Comptroller of the Currency against a bank. The orders were issued subsequent to the dates of crimes charged in the indictment. Although the orders were not admitted into evidence, the prosecutor referred to them a number of times before the jury. The Court stated:

> Standing alone, the prejudicial effect of these orders on the jury would require reversal. In the event government counsel desires to use Cease and Desist Orders in its case, the trial court should conduct a hearing, outside the presence of the jury, to determine the relevance, if any, of these orders and weigh that relevance against their highly prejudicial nature.

614 F.2d at 495. Unlike the orders in *Christo,* the order in this case was relevant to a number of issues in the case, and this probative value outweighed any prejudicial effect of the order. The trial judge did consider the order's relevance in chambers with the attorneys. The court did not abuse its discretion in admitting the cease and desist order.

### B. *Check Kite*

Before calling two bankers as defense witnesses to prove the Gregorys' creditworthiness, defendants moved to limit cross-examination of those witnesses about a check kite between the two banks. The court ruled that if the defense introduced the testimony of the two bankers to show that the Gregorys had excellent credit and bank relations, that would open the door to proof of the check kite, both to show problems in bank relations and to show that the Gregorys had cash flow problems.

The defense called one of the bankers and introduced testimony about the Gregorys' credit and repayment history. The

defense also presented testimony from Vonna Jo Gregory that the Gregorys had never had a check returned from accounts at the two banks.

In their rebuttal to the defense case, the Government started to prove the check kite. One of the bankers was recalled to produce documents, and an FDIC examiner testified about the excessive use of uncollected funds in the 21 Gregory accounts at one of the banks. The court then reversed its ruling on the admissibility of the evidence, reasoning that although the defense had opened the door to the evidence and it was relevant, because the evidence of the check kite was lengthy and would be fresh in the jury's mind at the end of the case, it would cause prejudice and delay outweighing its probative value. The court then instructed the jury to disregard the evidence.

■ There was no abuse of discretion in the trial court's admission and later exclusion of the evidence of the check kite. At the time the evidence was excluded, the jury had heard the banker's testimony that the Gregorys were not conducting a check kite. The FDIC examiner had not given his opinion. The court's instruction to the jury to disregard the evidence cured any prejudice.

### C. Evidence of Gregorys' Credit and Employment History

■ The Gregorys claim the trial court erred in excluding evidence of their prior credit and employment history. They were not allowed to introduce (1) evidence that they borrowed over a million dollars in 1971 and repaid it on schedule, (2) their credit history over the course of their business careers, (3) their credit standing in 1974, (4) two letters from bankers concerning their creditworthiness, or (5) evidence that Mrs. Gregory had worked all her adult life. The excluded evidence was crucial to the Gregorys' defense, they argue, because it showed their intent to repay the money borrowed from the Bank.

This evidence, if relevant to the defense, was cumulative. Both of the Gregorys testified about their background and employment history. The court admitted evidence of numerous loans made to the Gregorys, along with evidence that they were not late on any loan payments until 1978. In light of all the evidence concerning their credit history, the exclusions by the trial court were well within its discretion.

### V. Severance

Defendants claim that the Gregorys, Spurlock and Atkinson should have had separate trials. The Gregorys filed a motion for relief from prejudicial joinder on June 30, 1980, and the motion was adopted by Spurlock and Atkinson. In the motion, the Gregorys alleged that if severed, Spurlock and Atkinson would give testimony beneficial to the Gregorys. The motion to sever was carried with the case, but at the beginning of trial it was not called to the new trial judge's attention. All the defendants were tried together.

■ To warrant reversal of a conviction for abuse of discretion in the decision whether to sever, the appellant bears the burden of showing "specific and compelling prejudice." *United States v. Hewitt*, 663 F.2d 1381, 1388–89 (11th Cir.1981). The Gregorys have made no such showing here.

Atkinson and Spurlock claim they were prejudiced by the evidence of the Cease and Desist Order and the Gregorys' check kite. It is not clear that the trial court was presented with this ground for severance. The record indicates the defendants moved for a mistrial, not for a severance, concerning the evidence of the Cease and Desist Order. Spurlock and Atkinson adopted the Gregorys' motion *in limine* concerning the check kite, but did not move for a severance.

On several occasions, the trial court instructed the jury not to consider evidence against a particular defendant unless it pertained to that defendant. The check kite clearly pertained only to the Gregorys. The Cease and Desist Order was relevant to the prosecution of the bank officials in the same way it was relevant to the Grego-

rys' case. Under these circumstances, Atkinson and Spurlock have shown no specific and compelling prejudice based on the introduction of this evidence at their trial.

## VI. *Motions for Acquittal and New Trial*

The trial court refused to consider the merits of motions for acquittal and for a new trial on the ground they were too late and the court lacked jurisdiction.

The time for moving for acquittal and new trial is governed by Fed.R.Crim.P. 29(c) and 33. Rule 29(c) provides that "a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7-day period...." Under Rule 33, a motion for new trial, based on grounds other than newly discovered evidence, "shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7-day period." The jury returned a verdict of guilty in this case on April 5, 1982. The defendants' written motions for judgment of acquittal and for a new trial were not filed until April 26, 1982. Although this was not within the 7-day period following April 5, defendants contend the motions were timely because they were made "within such further time as the court may fix during the 7-day period." William J. Baxley, the attorney for the Gregorys, filed an affidavit stating that on April 8, 1982, the district court orally granted an extension of time allowing the defendants until April 26, 1982 to file their motions for acquittal and new trial. "There was absolutely no equivocation nor contingencies and I was distinctly told by the Court that we would have until April 26, 1982, to file our motions...."

Apparently a written motion for extension of time was filed with the clerk of the district court in Mobile, Alabama, on April 8, 1982, but the trial judge did not receive the motion until April 14. The court entered a written order denying the extensions on April 15, 1982. On April 29, 1982, the court denied a motion to reconsider the extension, and the April 26 motions for acquittal and new trial, stating that it had "no jurisdiction of this matter, the time for consideration of the motions having lapsed."

■ If the trial court orally granted the extension of time within the 7-day period, as represented in the Baxley affidavit, it did not lose jurisdiction over the motion merely because its ruling was not reduced to writing within the 7-day period. Therefore, if the extension was orally granted, the court should have considered the April 26 motions on the merits. Rather than remand the case, however, we have examined the record and determined that the court could not have granted either motion without going outside the bounds of discretion given it in such matters. The denial on jurisdictional grounds was therefore harmless error.

■ In considering a motion for judgment of acquittal, the evidence must be considered in the light most favorable to the Government, together with all inferences reasonably drawn from the facts, to determine whether there is substantial evidence from which a jury could reasonably find the defendants guilty beyond a reasonable doubt. *United States v. Martinez*, 486 F.2d 15 (5th Cir.1973). Because the evidence is sufficient to sustain the convictions in this case, *see* Part III, *supra*, it would have been improper for the trial court to grant the defendants' motions for judgments of acquittal.

■ The grant or denial of a motion for new trial rests in the sound discretion of the trial court. *United States v. Riley*, 544 F.2d 237 (5th Cir.1976), *cert. denied*, 430 U.S. 932, 97 S.Ct. 1554, 51 L.Ed.2d 777 (1977). Although this standard provides some latitude for the district court to either grant or deny a new trial without meriting reversal on appeal, any grant of a new trial on the grounds asserted in this case would not withstand review under the abuse of discretion standard. Most of the grounds for new trial set forth in the defendants' motion have been addressed on this appeal,

and the other grounds asserted are without merit. Remand to the trial court for consideration of the motion for acquittal or new trial is therefore unnecessary.

AFFIRMED IN PART and VACATED and REMANDED IN PART WITH DIRECTIONS.