UNITED STATES of America

v.

G. William JONES and Ernie H. Tate.

Crim. No. CR 83–24A.

United States District Court,
N.D. Georgia,
Atlanta Division.

July 17, 1984.

James M. Griffin, Dept. of Justice, Atlanta, Ga., for plaintiff.

Edward T. M. Garland, Garland, Nuckolls & Catts, P.C., Atlanta, Ga., for defendant Jones.

## ORDER

ORINDA D. EVANS, District Judge.

This criminal case is now before the court for consideration of the motion of Defendant G. William Jones ("Jones") to dismiss the federal indictment against him.

### A. *Factual Background*

On November 21, 1980, Jones and his employer, Ashland-Warren, Inc., were indicted by a Fulton County Grand Jury ("grand jury") on charges of "conspiracy in restraint of free and open competition in transactions with the State." The indictment specifically alleged "bid-rigging" on highway construction projects let by the Georgia Department of Transportation. During all relevant periods, Jones was a

regional vice-president of Ashland-Warren, a major heavy construction and asphalt paving company with headquarters in Atlanta, Georgia. Also on November 21, 1980, the same grand jury indicted Dan P. Shepherd, J. Harold Shepherd and Shepherd Construction Company for related offenses.

On December 21, 1981, Ashland-Warren entered into a settlement agreement with the State of Georgia whereby the charges against Ashland-Warren and its employees, including Jones, would be dismissed and Ashland-Warren would plead to a lesser charge. Pursuant to that agreement, Jones and other employees would be granted immunity and subpoenaed to testify before the grand jury as part of the state's investigation of alleged bid-rigging. Prior to that date, counsel for Ashland-Warren and Jones suggested to the Director of Operations of the Justice Department's Antitrust Division that the federal government also grant immunity to Jones since the State was planning to do so. That suggestion was rejected prior to December 22, 1981.

Before the settlement with the state was finalized, Ashland-Warren provided state prosecutors with a proffer of Jones' testimony. The prosecutors found the proffer satisfactory and proceeded with the settlement. The Attorney General of Georgia, Michael Bowers, was then informed that the proffer was satisfactory, that it would aid in the state's investigation of bid rigging, and that the settlement was being finalized. Bowers was not given the substance of Jones' testimony nor was he told any specific details of that testimony.

On December 22, 1981, Jones and several other employees of Ashland-Warren appeared before the grand jury to testify. They were then granted immunity, the state charges against them were dismissed, and they did testify. Jones again testified at a further grand jury hearing in March of 1982. Subsequent to December 22, 1981, Jones also submitted to a transcribed interview and a separate non-recorded interview with state prosecutors.

In a state court hearing later on December 22, 1981, attended by the press, Ashland-Warren entered a plea pursuant to the settlement agreement with the state. At that hearing, one of the state prosecutors informed the court that charges against Ashland-Warren's employees had been dismissed pursuant to the settlement agreement and that some of those employees had already appeared before the grand jury and had given immunized testimony. Jones' attorney, Mr. Ed Garland, was also present and he informed the court that his client had been one of those who gave immunized testimony.

Following the hearing, Bowers issued a press release indicating that the settlement agreement was a "major breakthrough" in the state's investigation of bid-rigging and that the investigation had gained "significant momentum" as a result of the information supplied by the Ashland-Warren employees. He added that the prosecution of other such companies and their officials would be expedited by the information obtained from those employees. Bowers did not disclose the substance or any details of the testimony of Jones or the other employees.

On the evening of December 22, 1981, Jones separately telephoned Robert E. Matthews, of C.W. Matthews Contracting Company, and Dan P. Shepherd. He informed each of them that he had appeared before the grand jury earlier that day, that he had testified truthfully, and that he was sorry. He did not specifically disclose the substance of that testimony to either Matthews or Shepherd. Dan Shepherd then told his brother, J. Harold Shepherd, about the call from Jones. Both Dan Shepherd and Robert E. Matthews informed their lawyers of Jones' call shortly after receiving it.

In a letter dated January 26, 1982, one of the state prosecutors provided defense counsel for Shepherd Construction, Dan P. Shepherd and J. Harold Shepherd with a witness list in the state's case against the Shepherds that included Jones' name and names of other Ashland-Warren employees.

Several articles appeared in The Atlanta Constitution, a major daily newspaper serving Atlanta, Georgia and surrounding counties, related to the Ashland-Warren settlement. The articles focused on the investigation and indictments in the bid-rigging cases and specifically mentioned the terms of the settlement agreement and the importance of the immunized testimony. The first article, dated December 23, 1981, states in part:

> ... Ashland-Warren officials will have to testify for the state and before grand juries in the state's effort to document and prove highway bid-rigging charges against other road-paving companies.

The article then mentions that Jones' attorney, Ed Garland, stated in court the previous day that Jones and a fellow executive, E.L. Ogren, had appeared before a grand jury that day and had been granted immunity, although neither Garland nor other attorneys would give details of what went on in the grand jury proceedings. Bowers is identified as stating that prosecution of additional road-building firms and their officials should be expedited by Ashland-Warren's cooperation. The article also specifically identifies Shepherd Construction Company, Dan P. Shepherd and J. Harold Shepherd as having been indicted and discusses the charges against Ashland-Warren and Shepherd.

The second article, dated January 7, 1982, states that testimony of Ashland-Warren officials was expected to be used in the trial of Shepherd Construction and Dan and J. Harold Shepherd scheduled for March 29, 1982. That article also mentions that Bowers had described Ashland-Warren's cooperation as a "major breakthrough" in the investigation. The article does mention Jones and Ogren by name and states that charges were dropped against them in exchange for their cooperation and testimony.

The third article, dated March 6, 1982, states that according to court documents, the investigation had expanded to include C.W. Matthews Construction Company and its president, Robert C. Matthews. It also mentions that the Matthews firm and Ashland-Warren were under investigation at that time by federal antitrust authorities regarding suspected highway bid-rigging conspiracies. The article then goes on to mention that the Matthews Company and Ashland-Warren were both indicted by a federal grand jury in North Carolina on bid-rigging charges. It later states:

> Testimony from Ashland-Warren officials not only is expected to be a major factor for the prosecution in the trial later this month for the Shepherd Company and two of its top officials, but apparently is a key element in the state's effort to indict the Matthews firm.

The article does not mention Jones specifically. However, it does identify some of the construction projects involved.

The final article, dated March 13, 1982, states that Matthews Contracting and Robert E. Matthews were indicted by the grand jury the previous day for conspiring with Ashland-Warren, Jones, Shepherd Construction, and Dan and J. Harold Shepherd to rig bids on state highway projects. The article also mentions that Jones and Ogren had received immunity in exchange for testifying, that testimony from Ashland-Warren officials appeared to be a significant element in obtaining the Matthews' indictments, and that Ashland-Warren officials were expected to testify for the prosecution in the Shepherd trial. The article went on to say that two Matthews' employees, Lamar Lawson and McRay Newsome, were granted immunity by the state earlier in the week and had been subpoenaed to testify before the grand jury the previous day. The five construction projects involved in the indictment were specifically identified in the article.

On March 12, 1982, C.W. Matthews Contracting Company and Robert E. Matthews were indicted by the state grand jury. A plea agreement was reached and guilty pleas were entered on April 5, 1982. Previously, on March 20, 1982, the Shepherds had entered guilty pleas pursuant to a plea agreement with the state.

During the spring of 1980, prior to the state indictment of Ashland-Warren and Jones, a federal grand jury investigation into alleged bid-rigging began in Atlanta, Georgia. By the summer of 1980, Ashland-Warren and Jones, as well as other construction firms and their individual officers, were under investigation by both state and federal prosecutors for alleged bid-rigging. Although the investigations proceeded separately, they both focused on highway construction bid-rigging in Georgia. Some of the construction projects being investigated were the same in both the state and federal investigations. Subsequent to the Ashland-Warren settlement agreement with the state and the immunized testimony to the grand jury, the following individuals and companies entered into pre-indictment plea agreements with the United States (on the dates indicated) pursuant to which they gave information to federal prosecutors regarding alleged bid-rigging: Lamar Lawson (January 27, 1982), Robert E. Matthews (February 25, 1982), C.W. Matthews Contracting Company (March 1, 1982), Dan P. Shepherd (March 4, 1982), J. Harold Shepherd (March 4, 1982), Shepherd Construction Company (March 4, 1982), Louie A. Pittman, Jr. (September 10, 1982), Pittman Highway Contracting Company (September 10, 1982), Robert S. Riley (November 12, 1982), and Claussen Paving Company (November 12, 1982).

In negotiating the plea agreements with the above individuals and companies, federal prosecutors met numerous times in late 1981 and early 1982 with counsel for those individuals and companies. They also met with state prosecutors on several occasions pursuant to their investigation. As a result of meetings with state prosecutors and through media reporting, the federal prosecutors knew of the possibility and actuality of an Ashland-Warren settlement agreement and immunized testimony. However, the actual substance of the testimony was never revealed to the federal prosecutors by the state prosecutors. During the negotiations between the federal prosecutors and defense counsel, although the Ashland-Warren settlement and/or immunized testimony may have been mentioned in passing, there was no discussion of those events nor was the substance of the testimony referred to or disclosed.

The federal prosecutors desired the cooperation of Georgia road construction companies and their officials in order to obtain incriminating evidence against Ashland-Warren employees before those employees gave public immunized testimony. Although the federal prosecutors felt that such cooperation could substantially advance the investigation and prosecution of Ashland-Warren and its employees, they felt that it would be of little value unless it was obtained before those employees gave public immunized testimony in a state proceeding.

Each of the individuals named above who cooperated with the federal prosecutors gave information regarding Jones. All of those individuals, except Dan Shepherd and Louie Pittman, testified before the federal grand jury. On January 27, 1983, the federal grand jury returned an indictment against Jones charging that he and a co-defendant had conspired to rig the bidding on a paving construction project at the William B. Hartsfield Atlanta International Airport.

On February 17, 1983, Jones filed the present motion to dismiss, alleging that the indictment is based on evidence derived from his immunized testimony before the state grand jury and thus violates his Fifth Amendment rights. An evidentiary hearing regarding this motion was held before the magistrate on several days in August and September of 1983. The individuals who testified before the federal grand jury, as well as Dan Shepherd, gave testimony at the evidentiary hearing.

Lamar Lawson, an official of C.W. Matthews Contracting Company, testified that he was not told any of Jones' grand jury testimony by any of the prosecutors, state or federal, or his own attorneys. He was aware that Jones and other Ashland-Warren officials gave testimony to the state grand jury. In reaching his decision to

cooperate with the federal prosecutors and enter a plea agreement, he was primarily motivated by the fact that several companies and individuals had entered plea agreements in August, 1981, with federal prosecutors in North Carolina pursuant to a similar investigation in that state. Lawson felt that those individuals had implicated him and he would need to work out a deal with the prosecutors. His plea agreement was entered into in North Carolina and not in Georgia, but that agreement covered alleged misconduct in both North Carolina and Georgia.

Robert E. Matthews testified that although he was aware that Jones had appeared before the state grand jury, he was never told any of the substance of Jones' testimony by the prosecutors, his own attorneys or anyone else. He was also aware that Jones was listed as a witness on his indictment. He testified that there were several factors which led to his entering into a plea agreement with the federal prosecutors. These included the testimony of the companies and individuals in North Carolina in the fall of 1981 that led to the indictment of Lamar Lawson, the testimony of some Tennessee companies in 1980 that contributed to his state indictment in Georgia, the fact that Ashland-Warren employees had testified to the state grand jury, the decision of the Shepherds to abandon a trial in hopes of working out a reasonable plea agreement, the settlement of a civil suit which had arisen from the alleged bid-rigging, the decision of Lawson to enter into a plea agreement, the receipt of construction work from the State of Georgia in the fall of 1981, and the hope of reaching a settlement with the state prosecutors at about the same time.

Dan P. Shepherd testified that although he was aware that Jones had appeared before the state grand jury and was later named as a witness against the Shepherds for their scheduled trial, he was never told any of the substance of Jones' testimony by anyone. He also testified that the fact that Ashland-Warren had worked out a deal, and that some of its employees had appeared before the state grand jury, had

an effect on the decision of the Shepherds to abandon their planned trial and try to make a deal with the federal prosecutors. However, he indicated that there were other factors that also played a part in that decision, including the testimony of the Tennessee companies that led to the state indictment of the Shepherds. His brother, J. Harold Shepherd, testified in a similar manner. He also added that the decision of the Matthews to negotiate a plea agreement was a significant factor in the Shepherds' decision to abandon trial and attempt a negotiation.

Robert Riley, who had been president of Claussen Paving Company, testified that he was aware that Jones had appeared before the state grand jury and he assumed that Jones had incriminated him with regards to a specific construction project. However, no one told him any of the substance of Jones' grand jury testimony. Riley also testified that he first decided to attempt to negotiate a plea agreement with the federal prosecutors in the fall of 1981. It was at that time that several contractors who had either been indicted by the state, or anticipated being indicted by the state or federal government, attempted joint settlement negotiations with the state. The joint settlement effort fell apart once Ashland-Warren settled with the state and its employees testified before the state grand jury. With the joint negotiations ended, the fact that the Ashland-Warren employees had testified was a factor in Riley's decision to enter into a plea agreement with the federal prosecutors and testify before the federal grand jury.

B. *Legal Analysis*

The motion to dismiss the federal indictment of Defendant Jones is founded on his legal contention that the indictment is based on evidence and information derived from his immunized testimony before the state grand jury. Specifically, Jones contends that a factor in the decision of the companies and individuals who cooperated with the federal prosecutors by giving information or grand jury testimony regard-

ing Jones was "their knowledge that Mr. Jones and his co-employees had previously testified before the Fulton County grand jury." He does not argue that those companies and individuals were aware of the substance of his testimony, and the facts indicate clearly that they had no knowledge of the contents of that testimony. Instead, he takes the position that the federal prosecutors made a "derivative use" of his testimony in obtaining the indictment because those companies and individuals knew that he had testified before the state grand jury and, therefore, they decided to cooperate and testify in order to improve their negotiating positions.

Although it has long been recognized that government must have some power to compel testimony in order to obtain necessary information for legitimate law enforcement purposes, for many years the grant of governmental immunity meant that the person compelled to testify could not be prosecuted for *any* conduct about which he had testified. *See Pillsbury Co. v. Conboy,* 459 U.S. 248, 103 S.Ct. 608, 612, 74 L.Ed.2d 430, 437 (1983). This broad protection of witnesses was referred to as "transactional" immunity and prosecutors were naturally reluctant to grant such immunity to witnesses who themselves were potential targets of criminal investigations. *Id.* By enacting the Organized Crime Control Act of 1970, Congress made immunity a more useful tool for law enforcement by replacing the broad "transactional" immunity with the more limited "use and derivative use" immunity found in 18 U.S.C. § 6002. *Id.* This statutory immunity allows testimony to be compelled, but only if that testimony, *or* any information directly or indirectly *derived* from that testimony, is prohibited from being used against the witness in any criminal case.

The constitutionality of such immunity was upheld in *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The Court held that a grant of immunity must provide protection to the witness coextensive with that provided by the privilege against self-incrimination, and further held that use and derivative use immunity provided such protection. *Id.* at 453, 92 S.Ct. at 1661. The Court then reaffirmed the following burden of proof originally noted in *Murphy v. Waterfront Commission of New York,* 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 1609 n. 18, 12 L.Ed.2d 678 (1964):

> Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they have an independent, legitimate source for the disputed evidence.

*Id.,* 406 U.S. at 460, 92 S.Ct. at 1665. The burden was further defined when the Court stated:

> ...it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

*Id.* at 460, 92 S.Ct. at 1665.

■ This burden of proof was recently applied in *United States v. Gregory,* 730 F.2d 692 (11th Cir.1984). Although the court in *Gregory, supra* did not identify the standard of proof the prosecution must meet, earlier cases have indicated that proof by a preponderance of the evidence is the standard to be used. *See United States v. McDonnel,* 550 F.2d 1010, 1012 (5th Cir.), *cert. denied,* 434 U.S. 385, 98 S.Ct. 123, 54 L.Ed.2d 96 (1977); *United States v. Seiffert,* 501 F.2d 974, 982 (5th Cir.1974).[1]

It is clear in the present case that no direct use of Jones' immunized testimony was involved in obtaining his indictment. Instead, Jones argues that a derivative use was made of his testimony. *Kastigar, supra,* does not provide a definition of "derived." However, that opinion does give

---

**1.** Decisions of the Fifth Circuit handed down prior to September 30, 1981 are binding precedent unless overruled or modified by the Eleventh Circuit en banc. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

insight into the meaning and scope of the concept of derivative use. The Court, at 453–54, stated that its holding was consistent with the earliest Supreme Court review of immunity, *Counselman v. Hitchcock*, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892). The Court then quoted portions of that earlier decision which criticized an immunity statute that failed to prevent the use of the witness' testimony to search out other testimony to be used against the witness and failed to protect against gaining from compelled testimony a knowledge of the details of a crime and of sources of information which may supply other means of convicting the witness.

A more recent decision, *Ulmann v. United States*, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956), was then cited as reaffirmance of the criticisms originally voiced in *Counselman*. The Court in *Kastigar, supra*, 406 U.S. at 454, 92 S.Ct. at 1661, quoted from *Ulmann* as follows (with the emphasis supplied in *Kastigar*):

> ... the immunity granted was incomplete, in that it merely forbade the use of the testimony given and failed to protect a witness from future prosecution *based on knowledge and sources of information obtained from the compelled testimony.*

In *Kastigar*, the petitioners argued that use and derivative use immunity was insufficient because it failed to protect against certain possible incriminating uses of the compelled testimony, such as the discovery of leads, names of witnesses, or other information not otherwise available that might result in a prosecution. However, the Court found that the immunity statute was comprehensive enough to bar the use of compelled testimony as an investigatory lead or as a means of focusing investigation on a witness as a result of his compelled disclosures. *Kastigar, supra* at 460, 92 S.Ct. at 1664.

In the present case, it is clear that none of the possible derivative uses mentioned in *Kastigar* were made of Jones' grand jury testimony. At the time Jones testified before the state grand jury, the federal inves-

tigation was already well under way. The companies and individuals who cooperated with the federal prosecutors were known to be suspects prior to Jones' testimony and most, if not all, had already been indicted by either the State of Georgia or the federal government operating in other states. In fact, joint settlement negotiations had begun several months prior to Jones' grand jury appearance. Jones himself had earlier been indicted by the state so that his identity as a suspect was known at the time he testified. Although the federal prosecutors were aware that Jones gave immunized testimony, their investigation was independent of the state investigations and they were never told the substance or any details of his testimony.

The government has proved by a preponderance that none of the traditional derivative uses, such as providing investigatory leads or focusing the investigation on the witness, were made of Jones' testimony. *Kastigar, Murphy, Ulmann,* and *Counselman* all strongly suggest, if not clearly state, that it is the *content* or *substance* of the compelled testimony which may not be used *by the prosecution* in any derivative manner. In this case the federal prosecutors made no use of the content or substance of Jones' testimony. However, Jones is asking this court to recognize a different form of "derivative use," one in which the *fact* that a witness testified, rather than the substance of his testimony, is used to entice others to provide information or testimony against him.

Jones relies on *United States v. Kurzer*, 534 F.2d 511 (2d Cir.1976) in support of his position regarding this different form of derivative use. In *Kurzer*, the immunized testimony of Kurzer and others was the basis for an indictment of Moe Steinman, who was already a target of the investigation pursuant to which the testimony was given. Following his indictment, Steinman learned that officers of certain companies with whom he had done business had "spilled the beans" to federal investigators regarding certain fraudulent schemes. Kurzer was not one of those officers and it

appears that Steinman was not aware that Kurzer had testified against him. When Steinman discovered that the government knew of his schemes, he decided to enter a plea in exchange for his cooperation. Kurzer's indictment resulted from information given by Steinman, although the charges against Kurzer were unrelated to those for which Steinman was originally indicted.

Kurzer moved to dismiss the indictment, arguing that it was the product of his immunized testimony. The district court held two evidentiary hearings on the issues raised in the motion. At the second hearing, Steinman began to testify concerning his motivation for cooperating with the federal prosecutors. However, the judge intervened during that testimony, indicated that he did not think Steinman's frame of mind was relevant, and refused to hear the rest of Steinman's testimony. The district court granted Kurzer's motion to dismiss, finding that his immunized testimony led the government to Steinman, who in turn led the government to Kurzer. The government appealed, arguing that Steinman's testimony regarding his reasons for cooperating with the government was relevant and should have been heard.

The appellate court recognized that none of the existing appellate cases applying *Kastigar* involved a claim that a witness' testimony was "derived" from someone else's immunized testimony because the witness was led to cooperate with the government due to an indictment obtained against that witness through the immunized testimony. *Kurzer, supra* at 517. The court did not decide if the meaning of "derived" in 18 U.S.C. § 6002 included an indirect relationship such as between Kurzer's immunized testimony and Steinman's testimony. Instead, the court avoided defining "derived" and chose to focus on the government's burden, which was to prove that Steinman's testimony was obtained from a legitimate source wholly independent of Kurzer's compelled testimony. *Id.* at 517. The court then held that evidence of Steinman's state of mind was relevant to that issue and remanded the case for further hearing to include the previously excluded testimony.

As a result of the framing of the issues in *Kurzer, supra,* and the court's failure to discuss the scope of the term "derived," that decision is of little help in the present analysis. The court did mention that since Steinman's identity and potential value as a witness were not discovered through Kurzer, the only way that Steinman's testimony could be "derived" from Kurzer's testimony was if the giving of Kurzer's testimony contributed to Steinman's decision to testify. *Kurzer, supra* at 517. However, the court did not indicate whether the "giving" of Kurzer's immunized testimony and its possible "contribution" to Steinman's decision to cooperate would be determined by Steinman's knowledge of the contents of the immunized testimony or merely his awareness that testimony was given.

■ With *Kurzer* providing no real assistance, this court will rely on its view of *Kastigar, supra,* and the cases cited in that decision. As previously indicated, the protection granted by immunity is a prohibition of *any* use by the prosecution, direct or indirect, of *any* of the content or substance of the compelled testimony. In *Kastigar, supra,* 406 U.S. at 458–59, 92 S.Ct. at 1663–64, and in *Murphy, supra,* 378 U.S. at 79, 84 S.Ct. at 1609, the Court noted that use and derivative use immunity leaves the witness and the government in the same position as if the witness had claimed his privilege against self-incrimination in the absence of a grant of immunity. Jones misinterprets that language and argues that since he did not have to testify under the Fifth Amendment privilege, then the fact that he did testify cannot be used in obtaining evidence against him. However, the Fifth Amendment does not protect Jones generally from being required to testify. Instead, it allows him to refuse to answer specific questions that might tend to incriminate him. He still must appear and answer those questions which do not tend to incriminate him. *Kastigar* and the other immunity cases do not suggest that the mere fact that a witness gave immun-

ized testimony is itself privileged or confidential. If there did exist such a privilege or confidentiality, Jones would have waived it by phoning several people shortly after testifying and telling them that he had testified.

C. *Conclusion*

 This court holds that no derivative use was made of Jones' grand jury testimony. Neither the federal prosecutors nor the companies and individuals who cooperated with them were ever told the contents of that testimony. Those companies and individuals learned of the fact that Jones had testified from sources other than prosecutors or other law enforcement officials. At the time of Jones' testimony, those companies and individuals were already aware that they were themselves under investigation, some of them had already been indicted, and they had already entered into joint settlement negotiations with the state prosecutors.

Although the fact that Jones had testified was one of several factors in the decision of each of those individuals to pursue or accelerate negotiations with the federal prosecutors, the analysis and evaluation in making that decision did not involve any participation or influence by the federal prosecutors or any knowledge of the contents of Jones' testimony. Furthermore, each of those individuals was also aware that one or more officials of Ashland-Warren besides Jones had testified before the state grand jury. In negotiating and obtaining the cooperation and testimony of those companies and individuals, the federal prosecutors did not make any use of the fact that Jones had testified.

Even if *Kurzer, supra,* had held that the government cannot use the existence of one witness' immunized testimony as leverage to obtain the testimony of other witnesses, it is clear that no such governmental conduct occurred in this case. This is not an example of "whipsawing" one witness to testify against a second witness, whereby the government pressures the first to testify against the second by indi-

cating to the first the incriminating nature of the second's immunized testimony against him.

For the reasons set forth above, Defendant Jones' motion to dismiss the indictment is hereby DENIED.