UNITED STATES of America

v.

**Clarence CLAY**

**No. CR. 99–137–N.**

United States District Court,
M.D. Alabama,
Northern Division.

Sept. 7, 2001.

Louis V. Franklin, Sr., U.S. Attorney's Office, Montgomery, AL, for Plaintiff.

Federal Defender, Montgomery, AL, for Defendant.

## ORDER

MYRON H. THOMPSON, District Judge.

Defendant Clarence Clay has challenged the jury selection procedure used to pick the trial jury that convicted him of drug crimes in violation of 21 U.S.C.A. § 846. As relief, he requests that the court grant him a new trial. Clay's challenge was referred to United States Magistrate Judge Charles S. Coody, who has now recommended that a new trial be granted. After consideration of the magistrate judge's well-reasoned recommendation and after an independent review of the record, the court concludes that the recommendation should be adopted and a new trial held.[1]

## I. INTRODUCTION

This case is one of several related to the Montgomery, Alabama end of a larger drug conspiracy. Clay is the cousin of John Riley, who organized the Montgomery operation. After severance from other defendants who went to trial, Clay was convicted of two counts of a 13–count indictment: he was convicted of joining the conspiracy led by Riley to distribute and possess with intent to distribute illegal drugs, mostly marijuana, and of using a communication facility to facilitate that conspiracy.

The events leading up to Clay's jury challenge are chronologically as follows: *August 18, 1999:* Clay, along with six co-defendants, was indicted for various violations of the Controlled Substance Act, 21 U.S.C.A. § 846. *February 22, 2000:* Clay, his attorneys, and the government attorneys appeared for jury selection. *February 24:* Clay filed a motion challenging the composition of his jury venire. *February 25:* Clay's jury trial begins, with the court reserving consideration of Clay's jury-challenge motion until after the trial. *March 1:* The jury convicted Clay. *March 7:* Clay filed a motion for new trial based on his earlier challenge to the jury venire. Clay therefore timely filed his objections to the

---

1. Clay also filed a motion for judgment of acquittal and motion for new trial on other grounds. By order entered on August 17, 2000 (Doc. no. 492), the court denied these motions.

process by which his petit jury was selected.[2] He bases his challenge on the due process and equal protection clauses of the fifth amendment, the sixth amendment's guarantee of a jury drawn from a fair cross section of the community, the Jury Selection and Service Act, 28 U.S.C.A. §§ 1861–1871 (JSSA), and the plan for the random selection of grand and petit jurors for the Middle District of Alabama.[3]

After the jury verdict, the court referred the jury-challenge motions to United States Magistrate Judge Coody for consideration and recommendation. After extensive discovery was taken, the magistrate judge held an evidentiary hearing on December 20, 2000. Although the magistrate judge determined that there was no suggestion or evidence that any person involved in the jury-selection process had ever acted with discriminatory intent, he entered a recommendation on February 5, 2001, urging the court to grant Clay a new trial on the grounds that the implementation of the Middle District's jury selection plan substantially violated the JSSA. On February 20, 2001, both Clay and the government timely filed objections to the magistrate judge's recommendation.

## II. STANDARD OF REVIEW

Pursuant to 28 U.S.C.A. § 636(b)(1), the court "shall make a de novo determination of those . . . recommendations to which objection is made." *Id.* The court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge]." *Id.* This court, therefore, reviews the recommendation of the magistrate judge de novo.

## III. FACTS

### A. Jury Selection Plan

The Middle District of Alabama covers 23 counties and is divided into three divisions: the northern division, the eastern division, and the southern division. The middle district adopted a written plan for jury selection pursuant to 29 U.S.C.A. § 1863(a),[4] which was approved by the Judicial Council of the Eleventh Circuit on April 23, 1997.[5] Every four years, under the plan, the court constructs a master jury wheel by randomly selecting at least 5 % of the registered voters of each of the counties in the district. The jury selection plan instructs the clerk of the court to select randomly from the master wheel a sufficient number of persons to maintain an adequate number of names in the qualified jury wheels for each of the district's divisions. The clerk may use a manual or computerized process to select names for

---

**2.** As required by 28 U.S.C.A. § 1867(d), Clay's attorney filed an affidavit attesting to her belief that the district's implementation of its written jury selection plan was a substantial violation of the JSSA. The United States does not contest the timeliness or procedural correctness of Clay's challenge.

**3.** Clay's challenge has been framed only as a challenge to the selection of juries in criminal cases in the Middle District of Alabama. Accordingly, in the instant opinion the court does not address the issue of jury selection in civil cases.

**4.** Section 1863(a) provides in pertinent part:

"Each United States district court shall devise and place into operation a written plan for random selection of grand and petit jurors that shall be designed to achieve the objectives of sections 1861 and 1862 of this title, and that shall otherwise comply with the provisions of this title."

**5.** *See* Recommendation of the magistrate judge, entered February 5, 2001 [hereinafter recommendation], at 3 n. 6.

the qualified wheels.[6] Whatever process of selection is used, the mathematical odds of any one name being selected must be substantially equal.

After selecting names from the master wheel, the court clerk mails preliminary juror qualification questionnaires to each person whose name was drawn. The plan does not indicate what, if any, steps the clerk must take regarding questionnaires that are not returned or are undeliverable.

When the questionnaires are returned, the plan requires the chief judge of the district, or his designee, to use the questionnaires to determine whether an individual is qualified, exempt, or excused from jury service. Under the plan, a person is presumed to be qualified unless she or he fits into one or more of five enumerated exceptions.[7] Those persons who are deemed qualified to serve as jurors are then placed into one of the qualified wheels based on their county of residence. The plan requires the northern division's qualified wheel to contain at least 600 names and the wheels for the southern and eastern divisions to contain at least 200 names each.

Because felony criminal trials in the district are held almost exclusively in Montgomery (the seat of the northern division of the district) whether or not the underlying offense occurred in the northern divi-sion, each criminal jury is composed of persons selected from all of the qualified wheels. When jurors are needed for a particular criminal term of court, the plan requires the clerk to select names randomly from each qualified wheel, and it mandates that the number of names drawn from each divisional wheel be in approximately the same proportion to the total number drawn as the number of names in the divisional wheel bears to the number of names in the master wheel.[8]

To select jurors, the plan contemplates that the clerk will use a combination of manual and computerized methods to make random selections from the qualified wheels. To select a panel of potential jurors for a criminal trial term, the clerk first chooses a "quotient number" for each division. A quotient number is the number of names in a wheel divided by the number of names needed for any particular drawing. The magistrate judge gives the following example: If the qualified wheel for the northern division contains 1,000 names and 20 names are needed from that division for a term of court, the quotient number would be 1,000 divided by 20, or 50.[9]

The clerk then draws a starting number at random from a deck of cards containing consecutively numbered cards up to the number of the quotient. The magistrate

---

6. Like the master wheel, the qualified wheels are all created anew every four years.

7. The exceptions are if the person in question: (1) is not a citizen of the United States, 18 years old, or older, who has resided for a period of one year within the district; (2) is unable to read, write, and understand the English language with the degree of proficiency to fill out the juror qualification questionnaire satisfactorily; (3) is unable to speak the English language; (4) is incapable by reason of mental or physical infirmity to render satis-factory service, or (5) has a charge pending against her or him for the commission of, or has been convicted in a state or federal court of record of a crime punishable by imprisonment for more than one year and her or his civil rights have not been restored. *See* recommendation at 4.

8. *See id.* at 5.

9. *See id.* at 6 & n. 21.

judge gives the following example by way of illustration: If the quotient is 50, then the clerk places cards numbered from one to 50 in a deck and randomly draws a card; if the number on the card that is drawn is 5, the clerk would select the fifth name from each divisional wheel, and then every fiftieth name thereafter.[10]

Next, the clerk enters the starting and quotient numbers into a computer program that selects names from each division's qualified wheel. A jury summons is sent to each individual selected. The plan, however, makes no provision for what steps, if any, the clerk must take regarding a returned or undeliverable summons.

Under the jury selection plan, jurors may, if summoned, petition for an excuse or exemption from jury service. Three provisions of the plan delineate the criteria for granting such petitions. First, the plan enables certain individuals to be excused from jury service;[11] second, the plan permits certain individuals to have their service deferred upon request;[12] and, third, the plan exempts certain individuals from jury service.[13] In addition to these criteria and categories, the plan gives discretionary authority to any judge requiring a jury panel for a particular term of court to grant permanent excuses from jury service, and vests the clerk of the court with the authority to grant temporary excuses. Such permanently excused persons receive "P" designations.[14]

The plan further provides that, "The names of grand and petit jurors who are excused from a panel or court term for reasons of hardship or extreme inconvenience, or because they are in excess of the needs of the Court for that panel or term, will be put back in the appropriate qualified jury wheels where they will be subject to being redrawn for subsequent service." [15]

## B. The District Court's Implementation of the Plan

The clerk of the court is responsible for implementing the plan. She is assisted by the systems manager and the jury administrator. The systems manager maintains the district's computer facilities, including the programs that assist in jury selection.[16]

---

10. *See id.* at 6 & n. 22.

11. The plan presumes that jury service would entail undue hardship or extreme inconvenience for individuals who are over age 70; have served as grand or petit jurors within two years; provide essential services to a business or agricultural operation; actively care for and have custody of an infirm person or child under age ten; or work for agencies that provide fire-fighting, rescue, or ambulance services. *See id.* at 7.

12. The plan authorizes such deferments to be granted to full-time ministers or members of religious orders; practicing physicians, pharmacists, dentists, or registered nurses; and actively practicing attorneys. *See id.*

13. Members of the active service of the United States armed forces, state and municipal fire or police departments, and public officers in the legislative, executive, or judicial branches of federal, state, or local government are exempt from jury service.

14. For example, the designation "PP" on a summons list indicated that the individual had received a permanent excuse for personal reasons. Similarly, PF, PB, PH, and PS stood for permanent excuses for family, business, health, or school related reasons respectively.

15. *See* recommendation at 8.

16. The systems administrator's tasks involved administering the computerized system that the clerk began using in the early 1980s to build the district's master wheel and qualified divisional wheels. To build the master wheel, the systems manager created a database from the voter registration information for the

The jury administrator is responsible for evaluating completed preliminary juror qualification questionnaires, constructing a summons list for terms of court, issuing summonses for jury duty, referring requests for permanent excuses to the appropriate judges, and processing requests for temporary deferment of jury duty.

Up to and through the selection of Clay's petit, or trial, jury, the clerk's office almost always granted temporary deferrals of jury service to individuals who claimed that jury service would create undue hardship or inconvenience. Such temporarily deferred individuals were designated "K" jurors, and their names were removed from the summons list by the jury administrator.[17] The names of these jurors were placed in a separate K file for each of the three divisions. The names of the K jurors were not returned to the divisional qualified wheels. In contrast, jurors whose names were drawn for a term of court from the divisional wheels, but who were in excess of the needs of the court for the term for which they were drawn, were returned to the divisional qualified wheels, where they were subject to being redrawn in the future.[18] These excess jurors were designated as "TZ" jurors.

Approximately one quarter of the persons who received a jury summons requested temporary deferral of service.

White jurors requested such deferral at twice the rate of that of African–American jurors.[19] As stated, the clerk's office granted the requests of almost all jurors who asked for temporary deferral of their jury duty. Thus, white jurors received K status at twice the rate of that of African–American jurors.

Although the district's plan provides for the random selection of names from the qualified wheels to create summons lists, the plan does not establish a procedure for including in these lists those K jurors whose deferrals have expired. Consequently, the clerk developed a procedure for compiling summons lists using K jurors. Under this procedure, the jury administrator recorded the starting number and number of jurors to be summoned from each division on a document called a "draw sheet." Next, the jury program displayed all the names of the K jurors and the starting dates for which they would be eligible for jury service. The clerk had no standard method of determining how many K jurors would be used in a particular draw list. Instead, the jury administrator arbitrarily used K jurors when their temporary deferrals expired. These K jurors were placed en masse at the top of the summons list for each division. The total number of K jurors used was then subtracted from the number of jurors needed for the term of court, and the remaining jurors needed to fill the sum-

---

counties in the district, and fed the data into the jury program. Next the systems manager, based on the number of names required for the master and divisional wheels, entered starting and quotient numbers into the program to generate a master wheel, from which, as described above, the divisional wheels were generated. See id. at 10.

17. The system for "K" designations paralleled that for "P" designations. Accordingly, KP, KF, KB, KH, and KS meant that a juror had

received a temporary deferral for personal, family, business, health, or school reasons respectively.

18. Jurors may be in excess of the needs of the court if, as frequently happens, cases settle in the days immediately before a trial term begins.

19. See recommendation at 9.

mons list were drawn randomly from the qualified wheels. The final summons list was printed by the jury program in the following order from top to bottom: (1) K jurors from the southern division, (2) non-K jurors from the southern division, (3) K jurors from the eastern division, (4) non-K jurors from the eastern division, (5) K jurors from the northern division, (6) non-K jurors from the northern division. Approximately four weeks before each term of court, jury packets were then mailed to the individuals on the summons list.[20]

The Middle District of Alabama's need for jurors dramatically decreases in the weeks before the beginning of each trial term as cases settle. As stated, individuals on the summons list who are in excess of the court's actual needs were assigned a TZ code. The jury administrator, who compiled the summons lists for Clay's trial term, assigned such codes by starting at the top of the summons list for each division counting down the number of names that she determined were needed for the term of court. The names below that number on the list were designated with the TZ code. After being informed by the clerk that they were excused from jury service, the TZ jurors were placed back in the qualified wheels for their divisions. Thus, a disproportionate number of non-K jurors generally were coded as TZ jurors and returned to the qualified wheels after

being drawn and placed on the summons list. Because African–Americans are less likely to request temporary deferrals, the coding-and-selection process resulted in such individuals being substantially more likely than non-African-Americans to be coded as TZ jurors.

In the final step of the district's implementation of the plan, the jury program creates a randomly ordered venire list from the names that were retained on the summons list. The randomly ordered venire list is provided to the attorneys before jury selection.

## C. Creation of the 1997 Master Wheel, Qualified Wheels, and Qualified Wheel Supplements

In late 1996, the plan required the district court to create a new master wheel and new divisional qualified wheels. The clerk hired a private business to create the wheels.[21] From the voter registration information from the district's 23 counties, the business compiled a master wheel of 43,201 persons.[22] However, the business mailed questionnaires to only 21,600 persons, or half of the number of persons in the master wheel. The business ultimately created qualified wheels that consisted of 25.02 % African–Americans.[23]

The district used the wheels produced by the private business for two years, un-

---

**20.** Jury packets consisted of a detailed four-page questionnaire, a juror information card, a summons, and a stamped return envelope.

**21.** Before 1996, the clerk's office itself used the jury program to compile the master wheel and qualified wheels from the voter registration information of the counties in the district.

**22.** *See* recommendation at 13.

**23.** There is some factual confusion regarding the percentage of African–Americans in the qualified wheels. *See* recommendation at 13 n. 57. Based on the government's allegation that the percentage of African–Americans in the wheel was 25 % and Clay's expert witness's contention that the figure was 25.02 %, the magistrate judge determined that the number was 25.02 %. The parties have not contested this finding of fact, and the court sees no reason to disturb this conclusion.

til, dissatisfied with the business's performance and concerned because the number of names in the qualified wheels began to dwindle, the clerk used the court's own jury program to supplement the qualified wheels. To do this, the systems administrator randomly selected 8,000 names from the list of 21,600 persons who had not received questionnaires from the private business and mailed them questionnaires. Ultimately the clerk's office deemed 3,387 persons qualified for jury service, and, in 1999, these persons were added to the qualified wheels for their divisions.

Following this supplementation, 19.97 % of the qualified wheels were composed of African–Americans. The petit jury for Clay's trial was selected from the supplemented qualified wheels.

#### D. The February 22, 2000, Trial Term

Clay's trial was scheduled for the term of court beginning February 22, 2000. Clay's summons list contained 349 names. Of these 65, or 18.63 %, were African–American, and 278, or 79.66 %, were white. However, 24.8 % of the summons list was made up of K jurors, of whom eleven, or 12.8 % were African–American, and 75, or 78.2 % were white. Approximately 120 persons on the summons list were coded TZ and were excused from jury service. The jury administrator composed a venire list of 111 names using the practices described above. Clay's venire consisted ultimately of the 105 persons who reported for jury service on February 22, 2000, of whom 12.4 % were African–American. Of the persons who reported for jury duty, however, 53.3 % were K jurors, of whom 8.9 % were African–American and 91.07 % were white.

### IV. DISCUSSION

■ After reviewing the magistrate judge's recommendation, along with Clay's and the government's objections, the court concludes that the findings of the magistrate judge are essentially correct: The practice of almost always granting temporary deferrals and then, upon expiration of the deferrals, constructing venire lists in such a way as to prefer the previously deferred jurors over those who were drawn directly from the qualified wheel was a substantial violation of the JSSA.

The magistrate judge identified two categories of challenges that Clay made to the process by which his venire was assembled. The first category is grounded in the plan itself and in the statute under which it was promulgated, the JSSA. The second category is grounded in the constitutional guarantees of due process and equal protection of the fifth amendment and the jury-trial right of the sixth amendment.

In the first category, Clay argued that the implementation of the plan by the court clerk violated both the plan and the JSSA. First, he argued that the custom of almost always granting deferrals to anyone, regardless of their occupational status, who claimed that jury service would be unduly harsh or inconvenient because of personal, family, or work-related obligations violated both the plan and § 1863(b)(5) of the JSSA. Second, Clay argued that the jury administrator's practice of recalling each division's K jurors and placing them en masse at the top of each division's summons list destroyed the randomness of his venire because a distinct, identifiable, and disproportionately white group of potential jurors had priority for inclusion in the venire. Third, Clay argued the jury administrator's practice of not assigning TZ codes to K jurors created a substantial likelihood that individuals who received temporary deferral of jury

duty would be included in the venire. Additionally, Clay argued that the clerk's usurpation of authority to determine the standards for granting temporary excuses and deferrals, the clerk's failure to obtain valid addresses for returned or undeliverable jury summonses, and the failure to maintain the appropriate number of names in the master and divisional wheels were substantial violations of the JSSA.

In the second category, Clay alleged violations of the equal protection and due process clauses of the fifth amendments, and the sixth-amendment guarantee of a jury drawn from a fair cross section of the community.

Challenges to federal jury selection in criminal trials may be based on the fair cross-section guarantee of the sixth amendment, *see Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the equal-protection and due-process clauses of the fifth amendment, *see Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (equal protection); *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (due process), or a substantial failure to comply with the provisions of the JSSA. *See United States v. Paradies,* 98 F.3d 1266, 1279 (11th Cir.1996). However, the right to a jury chosen at random is a "statutory creation." *United States v. Hawkins,* 566 F.2d 1006, 1012 (5th Cir.1978).[24]

## A. The Jury Selection and Service Act

■ The JSSA provides that "all litigants in Federal courts entitled to a trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C.A. § 1861. By its terms, the JSSA provides a remedy for only substantial failures to comply with its requirements. *See Paradies,* 98 F.3d at 1279; *see also United States v. Gregory,* 730 F.2d 692, 698–700 (11th Cir.1984). When the JSSA's goals of random selection of juror names or the use of objective criteria for determination of disqualifications, excuses, exemptions, or exclusions are frustrated, the court may find that a substantial violation of the act has taken place. *See Gregory,* 730 F.2d at 699. As the Eleventh Circuit has plainly held, "[m]ere 'technical' deviations from the Act or even a number of them are insufficient" to constitute a substantial violation of the JSSA that warrants relief. *See id.*

Section 1866(a) of the JSSA requires a randomized process of selecting names from a district's qualified wheels that culminates in the compilation of a summons list and a venire list. *See* 28 U.S.C.A. § 1866(a).[25] The JSSA also clearly provides for a process by which individuals whose jury service has been deferred— although the statute itself does not use the

---

**24.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

**25.** Section 1866(a) provides: ·

"The jury commission, or in the absence thereof the clerk, shall maintain a qualified jury wheel and shall place in such wheel names of all persons drawn from the mas-

ter jury wheel who are determined to be qualified as jurors and not exempt or excused pursuant to the district court plan. From time to time, the jury commission or the clerk shall publicly draw at random from the qualified jury wheel such number of names of persons as may be required for assignment to grand and petit jury panels. The jury commission or the clerk shall prepare a separate list of names of persons assigned to each grand and petit jury panel."

term—shall be called for service upon the expiration of their deferral. *See* 28 U.S.C.A. § 1866(c).[26] Section 1866(c) gives the drafter of a local plan a choice in how to use jurors whose duty has been deferred temporarily. As a default provision, the JSSA permits a district court to re-summon jurors under § 1866(b). That is, the act permits a district court to place such jurors in a recall pool from which they are subject to subsequent re-summoning. Alternatively, the JSSA permits a district to opt to place the names of such jurors back into the qualified wheel from which they were drawn and to subject them to being redrawn. As stated, the plan for the Middle District of Alabama calls for the names of deferred jurors to be returned to the appropriate qualified wheel.

■ The clerk's practice, however, as noted above, was to place the names of deferred jurors into a separate K juror pool, and to take names from that pool as their deferrals expired. The magistrate judge held that, although the clerk's practice deviated from the district's plan, it was not a substantial violation of the JSSA because such a practice was itself specifically, if alternatively, authorized by the JSSA. The court agrees.

The court also concurs with the magistrate judge's conclusion that it was a substantial violation of the JSSA for the clerk to prefer the K jurors over the jurors drawn directly from the qualified wheels for inclusion in the summons and venire lists. The court reaches this conclusion because it agrees with the magistrate judge that the combined practice of placing K jurors en masse at the top of the summons list, while striking excess jurors from the bottom of the list was not a legally random manner of compiling Clay's summons list, and that it presented a real and substantial opportunity for discriminatory treatment of jurors and of criminal defendants, which is forbidden by the JSSA.[27]

The JSSA requires that jury selection be random; but it does not define random-

---

**26.** 29 U.S.C.A. § 1866(c) provides in pertinent part:

"Except as provided in section 1865 of this title or in any jury selection plan provision adopted pursuant to paragraph (5) or (6) of section 1863(b) of this title, no person or class of persons shall be disqualified, excluded, excused, or exempt from service as jurors: Provided, That any person summoned for jury service may be (1) excused by the court, or by the clerk under supervision of the court if the court's jury selection plan so authorizes, upon a showing of undue hardship or extreme inconvenience, for such period as the court deems necessary, at the conclusion of which such person either shall be summoned again for jury service under subsections (b) and (c) of this section or, if the court's jury selection plan so provides, the name of such person shall be reinserted into the qualified jury wheel for selection pursuant to subsection (a) of this section."

**27.** One of the objections that the United States has made to the magistrate judge's recommendation is that because the use of jurors who have received temporary deferrals is specifically contemplated by the JSSA, the district's use of such jurors does not violate the statute. *See* objection of the United States at 6. The United States misunderstands the magistrate judge's and the court's reasoning. As explained below, it is not the *use* of K jurors on summons lists, but the *manner* in which they are used that violates the JSSA. Two hypothetical examples illustrate the point: A district court follows the JSSA's mandates but the jury administrator chooses to use only female K jurors in summons lists. Or, the jury administrator decides to divide K jurors into male and female subgroups and to place female K jurors at the top of the summons list and male K jurors at the bottom, thereby practically ensuring that the final venire lists will be predominantly, if not exclusively, female. These examples do not conform to the alleged infraction in Clay's case

ness as statistical randomness. *See United States v. Bearden,* 659 F.2d 590, 602 (5th Cir. Unit B Oct.1981). Congress considered that "It is sufficient for the purpose of this legislation if the plan adopts some system of selection that affords no room for impermissible discrimination against individuals or groups." *Id.* at 602 (quoting S.Rep. No. 891, 90th Cong., 1st Sess. 16 n. 9 (1967)). As the former Fifth Circuit Court of Appeals recognized, the law's underlying concern "is that the methods used must not result or have the potential to result in discrimination among cognizable groups of prospective jurors." *Id.*

In the instant case, the practice of arbitrarily selecting a number of disproportionately white K jurors and placing them on the summons lists in a manner that assured them positions on the final venire lists in criminal juries substantially violated the JSSA. It was non-random selection that created the "potential to result in discrimination among cognizable groups of prospective jurors." *Id.*

The selection was not random because of a combination of three factors: K-jurors are essentially self-selecting, the number of K jurors to be used in any one venire was left to the discretion of the jury administrator, and the jury administrator placed the K jurors in preferential posi-

tions on the summons list for a term of court, assuring them of inclusion on the final venires.

Permitting jurors to volunteer to serve, or not to serve, introduces an element of non-randomness into the selection of jurors. *See United States v. Kennedy,* 548 F.2d 608, 612 (5th Cir.1977) (overruled on other grounds by the present Fifth Circuit). The clerk's practice of almost always granting deferrals to jurors who requested them introduced a substantial element of voluntariness into jury service, and meant that the pool of K jurors consisted of individuals who had decided for various reasons not to serve at the time that their names were drawn from the divisional qualified wheels. As the former Fifth Circuit explained, "That the introduction of predilections of prospective jurors affects the random nature of the selection process cannot be gainsaid. Surely a district would be in substantial violation of the statute [JSSA] if it selected all its jurors by randomly drawing names from the qualified wheel and allowing those selected to opt in or out at will." *Id.;*[28] *see also United States v. Branscome,* 682 F.2d 484, 485 (4th Cir. 1982) (holding that use of volunteer jurors introduced an impermissible subjective element into jury selection). Arguably, then, when the clerk almost always granted deferrals to jurors, essentially

because they posit intentionally discriminatory practices. However, they plainly illustrate the fact that hewing to the requirement of the JSSA that deferred jurors be used when their deferrals are up may be done in a manner that substantially violates the statute.

**28.** This holding is not binding former Fifth Circuit precedent. Although the Court of Appeals found a substantial violation of the JSSA, it determined that the plaintiff had not complied with the strict procedural requirements for raising a statutory challenge to the

jury selection in his case. It was the procedural issue and not the substantive issue that was dispositive of the case; the court's discussion of the violation of the statute was, accordingly, dicta. *See, e.g., Hamilton ex rel. Hamilton v. Cannon,* 80 F.3d 1525, 1530 (11th Cir.1996) (defining dicta as those parts of a decision that are not essential to the holding). Nonetheless, the argument of the Court of Appeals has considerable persuasive value.

permitting selected jurors to opt in or out of a trial term at will, the practice introduced a non-random element into the jury-selection process.[29]

However, even if this practice introduced a non-random element, the practice, standing alone, frustrated none of the purposes of the JSSA. There is no evidence that, by itself, it caused juries to consist of something other than a fair cross-section of the community, or that it provided opportunity to discriminate against any cognizable group or any individuals in the selection process. By itself, then, the clerk's policy of granting deferrals was not a substantial violation of the JSSA.

An additional non-random element was introduced into the jury-selection process by the jury administrator's arbitrary selection of the number of K jurors to include on summons sheets. The evidence is undisputed that the clerk's office had no predetermined manner of choosing the number of K jurors to include on a summons list and that the jury administrator was free to include as many or as few such jurors as she determined was desirable. A similar practice was at issue in *Kennedy:* the clerk arbitrarily selected names from a list of jurors who had just completed a term of court. 548 F.2d at 610. Those jurors were then contacted and asked to volunteer for jury service. *See id.* In *Kennedy,* as discussed above, the Court of Appeals signalled that such an arbitrary practice did not meet the requirements of the JSSA. *See id.* Although the practice at issue in the instant case is less egregious than that in *Kennedy,* the court finds

the appellate court's conclusion persuasive, and notes that the arbitrary selection of a number of names of K jurors was a practice that conflicted with the demand of the JSSA that jury selection be random.

These two practices, when combined with the clerk's practice of placing K jurors en masse at the top of the divisional summons lists, substantially violated the act. The evidence is undisputed that the pool of K jurors differed materially from the pool of available jurors in the qualified wheels, and that this difference was consistent over time. The clerk's practice of placing an arbitrary number of jurors from the K pool on the summons list above the jurors selected directly from the divisional wheels, as stated, assured them a place on the final venire.

■ This violated the JSSA because it provided a clear opportunity for the jury administrator to control substantially the proportion of African–Americans on criminal juries. By increasing or decreasing the number of K jurors selected for any term of court and then preferentially placing those jurors on the summons list, the jury administrator could, with substantial probability, lower the number of African–Americans on a venire by a third or more. Although such control would be imperfect because the jury administrator could not know with assurance that such a practice would be effective in all cases, in any given venire it was substantially likely to be effective, and, over time, it almost assuredly could markedly decrease the number of African–Americans on juries in the dis-

29. This argument does not turn on finding that the jurors who volunteered not to serve by asking for deferrals subjectively were or were not aware of their control over when they served. If the jurors in this case were aware that they had such control, the court would be confronted with the possibly more substantial claim that the practice of granting deferrals itself was a substantial violation of the statute.

trict.[30] The jury administrator would not need to know the race of any of the individual jurors on the summons list or in the K pool to so discriminate. It would be enough to notice that non-African-American jurors requested deferrals of service disproportionately. The court stresses that there is no evidence that the jury administrator or any other member of the court staff engaged in intentional discrimination. However, that is not the legally relevant standard. A non-random selection practice is a substantial violation of the JSSA if it provides the opportunity to discriminate. *See United States v. Gregory,* 730 F.2d 692, 699 (11th Cir.1984); *Bearden,* 659 F.2d at 602. The practice at issue here clearly provided such an opportunity.

The court finds instructive the Fourth and D.C. Circuits' resolution of claims of similar alleged defects in jury selection. *See United States v. DeFries,* 129 F.3d 1293 (D.C.Cir.1997); *United States v. Branscome,* 682 F.2d 484 (4th Cir.1982).

In *Branscome,* the Fourth Circuit confronted a challenge to jury selection based on the JSSA in which volunteers from a randomly selected juror pool were asked to serve on a grand jury. "Each prospective juror who volunteered was permitted to serve, and the full complement of the grand jury was thereafter filled by random selection." 682 F.2d at 485 (footnote omitted). The case thus presented a situation in which one non-randomly selected subgroup was preferred for inclusion on a jury over a randomly selected subgroup of potential jurors. Although neither the dis-

trict court nor the Court of Appeals focused on this aspect of the claim, both courts concluded that the practice at issue substantially violated the JSSA.

In *DeFries,* two criminal defendants raised a challenge to the selection of their petit jury under the JSSA. *See* 129 F.3d at 1299. They argued that "white jurors were systematically underrepresented in the juror pool they received." *Id.* Although white jurors constituted roughly a third of eligible jurors in the district, only 23 % of the members of the defendants' venire was white because white jurors received deferrals of their jury service at a higher rate than African–Americans. *See id.* The D.C. Circuit held that "such a practice would be cause for concern, [but] appellants have produced almost no evidence of its existence, let alone evidence that it was a regular occurrence." *Id.* at 1300.

In the case at bar, there is uncontroverted evidence that the use of K jurors resulted in a similar disparity between the percentage of African–Americans on Clay's venire and in the divisional wheels, and that such disparity was, indeed, a regular occurrence.

Both *DeFries* and *Branscome,* read together, address the material circumstances at issue in the instant case: a non-random, distinct group of potential jurors that differed by its willingness to serve and in its racial composition from the group of potential jurors on the qualified wheels was given preferential treatment. Its members were, as a practical matter, assured of inclusion on venires in contrast to poten-

---

**30.** Such control might even become more extreme and more predictable toward the end of each four year period, right before the master wheel and qualified wheels are rebuilt. Logically one would expect the proportion of Afri-

can–Americans to rise in the qualified wheels as African–Americans are disproportionately coded TZ and whites are disproportionately used because of K juror preference.

tial jurors who were randomly drawn directly from the qualified wheels.

The deficiency of jury selection in the Middle District that Clay has established goes to the heart of the random selection process required by the JSSA. And it tends to exclude a cognizable group of eligible jurors. As stated, the court agrees with the magistrate judge and concludes that this practice substantially violated the JSSA.

### B. Constitutional Challenges to Jury Selection

"(A) federal court should not decide federal constitutional questions where a dispositive nonconstitutional ground is available." *Hagans v. Lavine,* 415 U.S. 528, 547, 94 S.Ct. 1372, 1384, 39 L.Ed.2d 577 (1974). This doctrine is so deeply rooted in the process of constitutional adjudication that federal courts should only reach constitutional questions when they cannot avoid doing so. *See Spector Motor Service v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944). Thus, whenever statutory or other nonconstitutional grounds might resolve a case, federal courts must address those issues first. *See New York Transit Authority v. Beazer,* 440 U.S. 568, 582, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979). Because this court has resolved Clay's challenge to the jury selection for his criminal trial on the basis of his statutory claim, it does not reach the constitutional grounds of his claim.

### C. Harmless Error

Next the court turns to the question of harmless error. In its objection to the magistrate judge's recommendation, the United States argues that the magistrate judge failed to consider whether the error was harmless to Clay, that the language of the JSSA that requires a violation of the law to be substantial to warrant relief incorporates the harmless error doctrine, and that the error alleged in this case was harmless. The government, however, is incorrect that Clay must show that he was actually prejudiced by a substantial violation of the JSSA in order for relief to be granted.

The settled law of the Eleventh Circuit is that "A litigant need not show prejudice to establish a 'substantial failure to comply' with the Act." *Kennedy,* 548 F.2d at 612. The Court of Appeals explained that:

"Congress deleted just such a requirement from the bill presented to the conference committee.... Moreover, when a statutory violation directly affects the random nature of the selection process, there is no need to show that the violation tended to exclude some cognizable group from that process. Congress did not simply outlaw certain disparities in representation of certain groups on juries; it designed a procedure of random selection to ensure that no such disparities would arise. A departure from the statutory scheme that directly affects the random nature of selection establishes a substantial violation independently of the departure's consequences in a particular case."

*Id.* (citation omitted). Accordingly, the court finds that the objections regarding the magistrate judge's failure to consider the question of harmless error will be overruled. Whether the error was harmless is not pertinent once the court has concluded that a jury-selection practice that directly affects the random nature of the selection process was a substantial violation of the JSSA.

### V. CONCLUSION

The court will therefore grant Clay a new trial with a jury selected without impermissible statutory and constitutional vi-

olations. In the wake of Clay's challenge to the Middle District of Alabama's jury-selection process, the court as a whole has changed or modified some its jury-selection practices. Indeed, it is because of these changes and modifications that the court, in its discussion of the background facts in this order, referred to some the court's jury-selection practices in the past tense.

Accordingly, it is ORDERED as follows:

(1) The objections filed by the United States on February 20, 2001 (Doc. no. 555), and the objections filed by defendant Clarence Clay on February 20, 2001 (Doc. no. 554), are overruled.

(2) The recommendation of the magistrate judge, filed February 5, 2001 (Doc. no. 550), is adopted.

(3) The motions by defendant Clarence Clay challenging the composition of his jury venire, filed February 24, 2000 (Doc. no. 289), and for a new trial, filed March 7, 2000 (Doc. no. 331), are granted.