[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-11400

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 5, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-00259-CR-N

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LEON CARMICHAEL, SR.,
a.k.a. Beaver Leon Carmichael,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(March 5, 2009)

Before TJOFLAT and MARCUS, Circuit Judges, and VINSON,[*] District Judge.

_____

[*] Honorable C. Roger Vinson, United States District Judge for the Northern District of
Florida, sitting by designation.

TJOFLAT, Circuit Judge:

I.

On November 19, 2003, a Middle District of Alabama grand jury returned a one-count indictment against Leon Carmichael, Sr. and Freddie Williams charging them with conspiracy to possess with intent to distribute over 3,000 kilograms of marijuana.[1]  A superceding indictment, returned on August 17, 2004, reasserted this conspiracy charge as Count 1 and added a second count against Carmichael, charging him with conspiracy to launder the proceeds of the marijuana conspiracy.[2]  The defendants pled not guilty to these charges and went to trial before a jury on June 6, 2005.

The Government, in its case-in-chief, presented several witnesses, including two drug traffickers, Gary Wayne George and Patrick Denton, who repackaged and sold marijuana for Carmichael.  By the time of his arrest by Drug Enforcement Administration ("DEA") agents on November 17, 2003, Denton packaged and sold between 200 and 500 pounds of marijuana per week and gave the proceeds to Carmichael.

---

[1]  See 21 U.S.C. §§ 841(a)(1) and 846.

[2]  See 18 U.S.C. § 1956(h).  The superceding indictment also contained a forfeiture count against Carmichael and Williams, in which the United States sought forfeiture of various assets, real, personal, and intangible.  Carmichael does not appeal the district court's rulings on the forfeiture count.

DEA agents arrested Denton at his home, where they had gone for the purpose of executing a search warrant. While the agents were executing the warrant, Carmichael telephoned Denton to say that he was coming over. At that point, Denton decided to cooperate with the agents. After giving Denton some instructions, the agents left Denton's residence to set up a surveillance. Carmichael arrived shortly thereafter and instructed Denton to go to Williams's house to help Williams repackage marijuana. Denton left for Williams's house, arriving there after first meeting with the DEA agents, who equipped him with audio and video devices. Once at Williams's house, Denton joined Williams in repackaging marijuana. They worked together until Williams received a phone call and left. After he departed, the DEA agents entered the residence with a search warrant and seized 574 pounds of marijuana. Later in the day, the agents arrested Carmichael and Williams and took them to the DEA headquarters for processing. When the agents were alone with Williams, they sought his cooperation. He responded by commenting, "[i]f I name names my children will be killed."

The jury found the defendants guilty as charged on June 17, 2005, after eight days of trial. On March 28, 2007, the district court sentenced Carmichael to concurrent prison terms of 480 months on Count 1 and 240 months on Count 2, to

be followed by a term of supervised release of five years.[3] On March 29, 2007, Carmichael filed a notice of appeal, challenging both of his convictions and his Count 1 sentence.

In his brief on appeal, Carmichael asks that we reverse his convictions and grant him a new trial on several grounds. Only one merits extended discussion. We dispose of the others with brief comment in the margin, along with Carmichael's appeal of his Count 1 sentence.[4]

The ground that merits discussion is the district court's denial of the motion Carmichael made on June 6, 2005, immediately prior to jury selection, which

---

[3] The court sentenced Carmichael and subsequently Williams (to a prison term on Count 1 of 70 months to be followed by five years of supervised release) after denying their post-verdict alternative motions for judgment of acquittal and for a new trial. The delay in the court's disposition of these motions was due to the time it took for the court to dispose of the defendants' challenges to the summoning and composition of the jury that tried the case.

[4] Carmichael argues that the district court "undermined [his] right to a presumption of innocence and violated Fed. R. Evid. 401, 403, 404(b) and the Fifth and Sixth Amendments." The argument focuses on (1) the court's partial jury sequestration order and the security measures it imposed in and around the courthouse; (2) the court's failure to grant a mistrial after learning that a juror had received a telephone call at 1 a.m. from an unrecognized number; and (3) the court's admission of purportedly hearsay statements into evidence. The court acted well within its discretion in ordering the sequestration and adopting the security measures, in refusing to grant a mistrial, and in its evidentiary rulings. See, e.g., United States v. Carmichael, 373 F. Supp. 2d 1293 (M.D. Ala. 2005) (concerning the admissibility of testimony of DEA agent Tom Halasz). Carmichael appeals his sentence on the ground that the district court erred in its calculation of his criminal history category under the Sentencing Guidelines by including his convictions in Alabama state court for murder and distribution of drugs (while in prison) for which he had been pardoned. Because the pardons were not based on Carmichael's innocence, the court properly included them. See United States v. Shazier, 179 F.3d 1317, 1319 (11th Cir. 1999) (citing commentary to U.S.S.G. § 4A1.2(j): convictions pardoned "for reasons unrelated to innocence" are to be counted in determining defendant's criminal history category).

challenged under the Jury Selection and Service Act of 1968 ("JSSA"), 28 U.S.C. §§ 1861 et seq., and the Sixth Amendment the validity of the venire that had been summoned to try the case. The district court deferred ruling on the motion until the trial was over and, then, only if Carmichael was found guilty. After the jury returned its verdict, the court referred the motion to a magistrate judge, who held an evidentiary hearing and issued a report recommending that the district court deny the motion. The court adopted the magistrate judge's recommendation, and in a lengthy opinion and order, rejected Carmichael's challenges. United States v. Carmichael, 467 F. Supp. 2d 1282 (M.D. Ala. 2006). We turn now to Carmichael's appeal of that order.

## II.

In evaluating Carmichael's appeal, we first discuss the way the Middle District of Alabama selected juries at the time Carmichael's case came to trial. Under the Middle District of Alabama's jury plan ("the Jury Plan"), every four years the court's Jury Administrator[5] randomly selected a pool of not less than five percent of registered voters in each of the Middle District's twenty-three counties. This list was known as the Master Jury Wheel. Second, the Jury Administrator

---

[5] The Jury Administrator is an employee of, and supervised by, the district court's Clerk.

randomly selected a percentage of the Master Jury Wheel for a shorter list, known as the qualified jury wheel ("QJW"). Third, the Jury Administrator mailed preliminary juror questionnaires to those selected for the QJW. When the questionnaires were returned, the chief judge or his designee determined whether each potential juror was qualified, exempt, or excused from service. Under 28 U.S.C. § 1865(b), a person is presumed to be qualified unless he or she fits into one or more of five enumerated exceptions.[6]

As need arose, the Jury Administrator used the QJW to randomly select jury pools of around 200 individuals. He mailed the pool members jury packets and summonses. Upon receiving summonses, individual pool members could request to be excused or deferred from service by showing undue hardship or extreme inconvenience pursuant to 28 U.S.C. § 1866(c).[7] Excused jurors were granted an

---

[6] Under both the JSSA and the Middle District's plan, a person was excepted from jury duty if he or she: (1) was not a citizen of the United States eighteen years old who had resided for a period of one year within the judicial district; (2) was unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form; (3) was unable to speak the English language; (4) was incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or (5) had a charge pending against him for the commission of, or had been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights had not been restored. The jury plan also excepted others pursuant to 28 U.S.C. § 1863(b)(6).

[7] Based on undisputed evidence, the magistrate judge found, and the district court accepted, that "there [were] no written guidelines or criteria for determining undue hardship or extreme inconvenience; the Jury Administrator d[id] not look at the requesting juror's history file to determine how many deferments ha[d] previously been obtained; and almost all requests [were] granted." Carmichael, 467 F. Supp. 2d at 1292.

6

excusal for two years, at which time they were re-added to the QJW. Deferred jurors were removed from the summons list and placed into a deferred maintenance pool, separate from the QJW. Those jurors not excused or deferred were randomly placed on jury panels, which were provided to attorneys before jury selection.

Prior to a successful jury challenge in 2001, in United States v. Clay, 159 F. Supp. 2d 1357 (M.D. Ala. 2001), the Jury Administrator granted almost all requests for deferral of jury service. The Jury Administrator then placed deferred jurors into a deferred maintenance pool and re-summoned them as soon as their deferrals expired. In this manner, deferred jurors were added to the summons list along with those randomly selected from the QJW. Because white jurors requested deferral approximately twice as often as black jurors, jurors in the deferred jury pool were disproportionately white. The total pool of summoned jurors was therefore disproportionately white as well. The Jury Administrator heightened this effect by placing previously deferred jurors at the top of the summons list, thereby increasing the likelihood that these jurors would be included in the venire. In Clay, the district court held that this arrangement violated the JSSA. Clay, 159 F. Supp. 2d at 1370. After Clay, the Middle District amended its plan to limit the percentage of previously deferred jurors summoned

7

to any given pool to 15% and to require that previously deferred jurors be scattered randomly throughout the summons list.

In 2001, the Middle District created a new jury wheel. The Jury Administrator randomly selected a group of 99,604 voters for the Master Jury Wheel. The Jury Administrator then randomly selected 25,000 names from the Master Jury Wheel and mailed these jurors questionnaires. Those who were determined to be qualified made up the QJW, which was supplemented several times through additional mailings over the next four years. In 2001, African Americans constituted 20.74% of the QJW, despite the fact that they constituted 30.47% of the Middle District's population.

As he summoned pools from the 2001 QJW, the Jury Administrator continued to grant almost all deferral requests, placing deferred jurors into the deferred maintenance pool. Pursuant to the post-Clay plan, the Jury Administrator was limited to re-summoning 15% or less of the jurors for each pool from the deferred maintenance pool, even if this meant that jurors whose deferrals had expired were not summoned. A new Jury Administrator, who took office in March 2005, accidentally violated this 15% limit in four of the last five jury pools drawn from the 2001 four-year cycle. One of these pools was the pool drawn for Carmichael's trial; because of the Jury Administrator's mistake, 24.5% of that

8

pool was drawn from the deferred maintenance pool.

Furthermore, because of a technical glitch, on five occasions throughout the life of the 2001 QJW, the Jury Administrator accidentally transferred persons from the deferred maintenance pool back onto the QJW, from which they could be summoned without regard to the 15% limit. In total, the Jury Administrator accidentally transferred 1,093 deferred jurors onto the QJW, 460 of whom were ultimately chosen for jury service. Seven previously deferred jurors who were accidentally transferred from the deferred maintenance pool to the QJW were chosen for the pool drawn for Carmichael's trial.

As a result of these combined errors, the percentage of previously deferred jurors drawn for Carmichael's pool was 26.67%, 11.67% above the 15% limit. African Americans made up 16% of Carmichael's jury pool.

III.

Carmichael challenged the venire summoned to hear his case under the JSSA and under the fair cross-section requirement of the Sixth Amendment. We review the district court's resolution of each of these issues in turn.

A.

The JSSA provides that "all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair

9

cross-section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. By its terms, the JSSA provides remedies only for a "substantial failure to comply" with its requirements. 28 U.S.C. § 1867(d). A JSSA violation is considered "substantial" when it frustrates one of the three principles underlying the Act: (1) random selection of juror names; (2) from a fair cross-section of the community; and (3) use of objective criteria for determination of disqualifications, excuses, exemptions, and exclusions. United States v. Gregory, 730 F.2d 692, 699 (11th Cir. 1984). The three JSSA principles seek the same goal of preventing impermissible discrimination in the selection process. "[M]ere technical deviations from the Act" that do not implicate this goal, even a number of them, are insufficient to warrant relief. Clay, 159 F. Supp. 2d at 1365. In United States v. Bearden, 659 F.2d 590 (5th Cir. Unit B 1981), for example, there were admittedly multiple technical errors in the jury selection process. However, in that case, we found no substantial violation of the JSSA, stating that,

> [i]n sorting out the details of statutory procedures, there is perhaps a tendency to lose sight of the fundamental purpose of the law. The purpose of the Act is to prevent discrimination, whether it be on account of "race, color, religion, sex, national origin, or economic status." 28 U.S.C.A. s 1862. Where the procedural errors made by those in charge of selecting juries do not raise the possibility of frustrating this goal, a court should be hesitant to order the drastic remedy of the dismissal of indictments.

Id. at 609.

10

With that said, we flesh out each of the three general principles. The randomness principle does not require statistical randomness but rather requires a "system of selection that affords no room for impermissible discrimination against individuals or groups." Id. at 602 (citing S. Rep. No. 891, at 16 n.9, 90th Cong., 1st Sess. (1967)). The objectivity principle prohibits selection based on subjective "criteria . . . which, intentionally or not, result or are likely to result in discrimination, or which fail to produce juries representing a fair cross section of the community." Bearden, 659 F.2d at 608. The types of subjective criteria that are prohibited are, for example, "good character, approved integrity, sound judgment and fair education. The problem recognized with their use [is] that '(i)n at least some instances, even though the jury selection officials were well intentioned, these additional qualification requirements have produced discriminatory results, especially in relation to the poor and other minorities.'" Id. (citing H.R. Rep. No. 1076, 90th Cong., 2d Sess. (1968)). The fair cross-section principle is identical to that required by the Sixth Amendment. United States v. Rodriguez, 776 F.2d 1509, 1510 n.1 (11th Cir. 1985) ("The standard for determining a violation of the statutory fair cross-section requirement is the same as that applied in assessing a sixth amendment fair cross-section violation."). We therefore discuss it in subpart B, infra, which addresses Carmichael's Sixth

11

Amendment claim.

In his pretrial motion, Carmichael alleged a number of JSSA violations. First, he noted that even after Clay, the Jury Administrator continued to grant virtually all of the deferral requests, which resulted in a disproportionately white deferred maintenance pool. Furthermore, the new jury administrator violated the 15% limit in two ways: by mistakenly transferring jurors from the deferred maintenance pool to the QJW and by exceeding the percentage chosen from the deferred maintenance pool itself. The district court agreed with Carmichael's factual allegations but held that those allegations did not constitute a substantial violation of the JSSA. We agree.

We first examine the Jury Administrator's policy of granting virtually all of the deferral requests. It is true that the policy came close to allowing jurors to opt in or out of service, thereby introducing a "non-random element" to jury service. However, "[t]here is no evidence that, by itself, [the policy] caused juries to consist of something other than a fair cross-section of the community, or that it provided opportunity to discriminate against any cognizable group or any individuals in the selection process." Clay, 159 F. Supp. 2d at 1368. "Indeed, the Jury Administrator's policy of granting almost all deferrals [was] almost definitionally objective, in that it [did] not favor one applicant over any other."

12

Carmichael, 467 F. Supp. 2d at 1294. "[I]nsisting upon a more rigorous review of deferral requests has the potential, paradoxically, to undermine objectivity in granting those requests." Id. at 1295. We therefore hold that this policy, standing alone, did not amount to a substantial violation of the JSSA. See Clay, 159 F. Supp. 2d at 1368 (holding the same).

We next look to the Jury Administrator's violation of the 15% limit in formulating Carmichael's pool. The Jury Administrator violated the limit by moving jurors from the deferred maintenance pool to the QJW and by exceeding the percentage chosen from the deferred maintenance pool itself. We consider this violation as especially serious given that in using this selection method, "the jury administrator would not need to know the race of any of the individual jurors on the summons list or in the [deferred maintenance pool] to . . . discriminate." Id. Just as in Clay, "[i]t would be enough to notice that [white] jurors requested deferrals of service disproportionately." Id.

Unlike in Clay, however, the Jury Administrator in this case did not give previously deferred jurors a preferential position for inclusion in the venire by placing them together at the top of the summons list. As the district court noted, "the jury administrator could not control whether any given juror – previously deferred or not – would ultimately be placed on the summons list in a position that

13

would ensure that juror's inclusion in the venire." Carmichael, 467 F. Supp. 2d at 1304. We also note that in this case, the Jury Administrator selected previously deferred jurors without regard to race and using only participant numbers. Ultimately, the jurors who exceeded the 15% limit were selected randomly by the jury selection software, not manually by the Jury Administrator. We therefore hold that although the Jury Administrator technically violated the jury plan and the JSSA, the violation did not frustrate the JSSA's overriding purpose of preventing discrimination and was not sufficiently substantial to give rise to a remedy.

Carmichael also argues that the Jury Administrator's policy of granting two rather than one-year excusals in violation of the Jury Plan constituted a substantial violation of the JSSA. He contends that, under this policy, deferred jurors became eligible for service more quickly than excused jurors and that this resulted in a larger number of disproportionately white previously deferred jurors being included on the summons list. This policy, however, did not frustrate the randomness principle because the prospective jurors, including those excused for two years, were still selected at random from a group of names without regard for race. It did not affect the objectivity principle because it did not affect on the method used to select jurors. See Bearden, 659 F.2d at 608 (noting that the objectivity principle prohibits the use of subjective criteria in the selection of

14

jurors). We accordingly hold that the policy was not a substantial violation of the JSSA.

Carmichael also alleged in his motion that the Jury Plan violated § 1863(b)(2) by failing to require districts to supplement voter lists, even when the voter lists failed to produce a fair cross section. Here, the voter list used to create the 2001 MJW was 20.74% African-American in a community that was 30.466% African-American. Section 1863(b)(2) provides that jury plans "shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title." This vague language, however, does not necessarily require that voter lists be supplemented when they over- or under-represent certain groups. In fact, "[t]he circuits are 'in complete agreement that neither the Act nor the Constitution require that a supplemental source of names be added to voter lists simply because an identifiable group votes in a proportion lower than the rest of the population.'" United States v. Orange, 447 F.3d 792, 800 (10th Cir. 2006) (citing United States v. Test, 550 F.2d 577, 586 n. 8 (10th Cir. 1976) (collecting cases) (internal quotations omitted)).

Finally, Carmichael complained that the Jury Administrator did not do enough to follow up on jury questionnaires that were returned due to out-of-date

15

mailing addresses, and that this caused a drop in the percentage of African Americans in his jury pool.  Admittedly, the Jury Administrator did not have any routine practice for securing updated addresses or for following up on questionnaires returned as undeliverable.  Neither the JSSA nor the Jury Plan, however, required the Jury Administrator to affirmatively pursue undelivered questionnaires.  Given this lack of authority, we decline to find a violation, let alone a substantial violation, of the JSSA.

B.

Carmichael alleged that the composition of his jury pool failed to satisfy the Sixth Amendment's fair cross-section requirement.  "In order to establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."  Duren v. Missouri, 439 U.S. 357, 364, 99 S. Ct. 664, 668, 58 L. Ed. 2d 579 (1979).  There is no question here that Carmichael established the first prong of the Duren test – African Americans represent a distinctive group in the community.  We hold that Carmichael failed to establish

16

the second prong of the Duren test, that the representation of African Americans was not fair and reasonable.  We therefore decline to address the third prong of systematic exclusion.

To analyze whether African Americans were fairly and reasonably represented in the jury pool, we compare the difference between the percentage of African Americans in the population eligible for jury service and the percentage of African Americans in the pool.  See United States v. Pepe, 747 F.2d 632, 649 (11th Cir. 1984).  Under black letter Eleventh Circuit precedent, "[i]f the absolute disparity between these two percentages is ten percent or less, the second element is not satisfied[,]" United States v. Grisham, 63 F.3d 1074, 1078–79 (11th Cir. 1995), and Carmichael failed to meet his burden of establishing that the representation of African Americans was not fair and reasonable.

Here, the percentage of African Americans eligible for jury service is in dispute.  Carmichael claims that this percentage is 30.466%, the percentage of adults residing in the Middle District that were African American, according to the 2000 census.  The United States disagrees, arguing that the relevant percentage should be the percentage of African Americans registered to vote in the Middle District.  According to the United States, voter registration data is a better measure of jury eligibility because it, unlike census data, automatically excludes persons

17

who would otherwise be ineligible to serve on a jury, including felons, criminal defendants, and otherwise ineligible persons. Although the record does not reveal the exact percentage of African Americans registered to vote in the Middle District, this percentage was probably close to the 20.74% of African Americans on the QJW, since the QJW was drawn randomly directly from the voter rolls.

In actuality, the percentage of African Americans eligible for jury service in the Middle District was probably somewhere between 20.74% and 30.466%. Because the record does not provide the information necessary to calculate the exact number, and because we ultimately hold that whatever figure we use, Carmichael falls short of the 10% threshold, we accept Carmichael's position for the sake of argument.

The percentage of the distinct group of the population in the appropriately challenged portion of the jury selection process was, in this case, the percentage of African Americans summoned from the 2001 wheel. Assuming that the percentage of African Americans eligible for jury service in the Middle District was 30.466%, Carmichael had the burden of showing that the percentage of African Americans summoned from the 2001 wheel was less than 20.466%, or in other words, that the number of African American jurors summoned divided by the total number of jurors summoned was less than 20.466%. Given that the total

18

number of jurors summoned was 13,097, Carmichael's burden was to establish that fewer than 2,680 of the summoned jurors were African American.

Carmichael argues that he met this burden because only 2,615 summoned jurors self-identified themselves as African American. As the district court noted, however, this argument ignores the 546 jurors who did not identify their race, and in effect assumes that none of these 546 jurors were African American. Given that the percentage of African Americans on the Middle District's voter rolls is 20.466%, it is likely that at least 66 of these 546 non-identifiers were African American.

We need not, however, speculate on the matter. Under the Duren test, Carmichael had the burden of showing lack of fair and reasonable representation. It was therefore up to him to show that fewer than 66 of those who refused to identify their race were African American. Carmichael failed to do so. His fair cross-section claims under the JSSA and the Sixth Amendment thus failed.

IV.

For the foregoing reasons, the judgment of the district court is AFFIRMED.